## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

*In re* FLORIDA CEMENT AND
CONCRETE ANTITRUST LITIGATION

**MASTER DOCKET NO. 09-23187-CIV-
ALTONAGA/Brown**

_____

(*DIRECT PURCHASER ACTION*)

*In re* FLORIDA CEMENT AND
CONCRETE ANTITRUST LITIGATION

**MASTER DOCKET NO. 09-23493-CIV-
ALTONAGA/Brown**

_____

*(INDIRECT PURCHASER ACTION)*

## ORDER

**THIS CAUSE** is before the Court on Defendants' Motion[s] to Dismiss with Prejudice the

Direct Purchaser Plaintiffs' Second Consolidated Amended Complaint and the Indirect Purchaser

Plaintiffs' Third Amended Consolidated Complaint (the "Motions") (Case 09-23187-CIV ("Direct")

[ECF No. 205]; Case 09-23493-CIV ("Indirect") [ECF No. 111]).  The two Motions are identical

and were filed by all Defendants in each action.  The Court has carefully reviewed the parties'

written submissions and applicable law.

## I.  BACKGROUND[1]

These two cases involve an alleged unlawful conspiracy in violation of section 1 of the

Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 1, among vertically-integrated cement

companies to fix, raise, stabilize or maintain prices of, and allocate customers and markets for,

_____

[1]  This section provides a summary of the well-pleaded allegations of the Second Consolidated
Amended Complaint ("DSCAC") (Direct [ECF No. 203]) in the Direct Purchaser Action.  The Corrected
Third Consolidated Amended Complaint ("ICTCAC") (Indirect [ECF No. 109]) in the Indirect Purchaser
Action contains essentially the same substantive allegations as the DSCAC with respect to the existence of
a conspiracy, and the parties have stipulated that the plausibility of the conspiracy should be tested under the
allegations of the DSCAC.  The facts in the background section are presented in the light most favorable to
Plaintiffs.

Portland cement,[2] ready-mix concrete,[3] and concrete block[4] in the State of Florida.  In the Direct

Purchaser Action, Plaintiffs[5] allege Defendants' actions in the cement and concrete markets were

specifically aimed at eliminating Defendants' primary competitors in the concrete market, known

as Independent Concrete Producers ("ICP[s]"), who directly purchase cement and concrete from

Defendants; Plaintiffs allege the conspiracy resulted in supra-competitive prices for cement and

concrete.  In the Indirect Purchaser Action, Plaintiffs[6] allege the supra-competitive prices caused by

---

[2]  Portland cement is the most common type of cement and is the primary ingredient in a number of construction materials, including concrete.

[3]  Concrete, or more specifically ready-mix concrete, is a mixture of cement, aggregate (sand, gravel, and crushed stone) and water.  Cement is the most expensive input in concrete.

[4]  Concrete block is a construction material used in walls in residential and commercial buildings. Concrete blocks are produced in various shapes and sizes by pouring cement, aggregate, water, and other materials into molds, and then curing the molded blocks in a kiln.

Plaintiffs use the capitalized form "Concrete" to refer to ready-mix concrete, mobile-mix concrete, and preformed blocks made of concrete.  However, in this Order the term "concrete" is used only to refer to ready-mix concrete because most of the allegations of a concrete conspiracy pertain to ready-mix concrete. Where necessary, concrete block or mobile-mix concrete is referred to specifically.

[5]  Plaintiffs in the Direct Purchaser Action are Action Ready Mix Concrete Inc. ("Action Ready Mix"), a purchaser of cement; Advantage Concrete of Florida, Inc. ("Advantage Concrete"), a purchaser of cement; Bay Area Remodelers, Inc. ("Bay Area Remodelers"), a purchaser of concrete; Carpenter Contractors of America, Inc. ("CCA"), a purchaser of concrete; Daniel Morgan Construction, Inc. ("Morgan Construction"), a purchaser of concrete; Family Pools, Inc. ("Family Pools"), a purchaser of concrete; Florida Block & Ready Mix ("Florida Block"), a purchaser of cement; Hard Rock Materials ("Hard Rock"), a purchaser of cement; Kroeger Enterprises, Inc. ("Kroeger"), a purchaser of cement and concrete; and Liberty Concrete and Masonry, Inc. ("Liberty"), a purchaser of cement and concrete.  The Direct Purchaser Plaintiffs bring suit as a class under Federal Rule of Civil Procedure 23(a) and (b)(3), seeking to represent a cement class defined as all persons or entities that purchased cement directly from one or more of the Defendants or their co-conspirators in Florida between January 1, 2004 and the present.  They also seek to represent a concrete class defined as all persons or entities who purchased concrete directly from one or more of the Defendants or their co-conspirators in Florida between January 1, 2004 and the present.

[6]  Plaintiffs in the Indirect Purchaser Action are Philip D. Sanford, who purchased cement and concrete indirectly from Defendants; Starfish, Inc., which indirectly purchased cement and concrete, including reinforced concrete pipe and concrete structures, from Defendants; and Sterling Development Company, which purchased cement and/or concrete indirectly from Defendants.  The Indirect Purchaser

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

the conspiracy were passed on to "indirect purchasers" of cement and concrete who were consequently injured by having overpaid for these products.

Defendants[7] are cement and concrete producers that control nearly all cement sales in Florida and own 90 percent of the concrete producers in the State.  (*See id.* ¶¶ 3, 157).  Each Defendant is vertically integrated because it produces and sells — directly or through a corporate affiliate — both cement and concrete.  (*See id.* ¶ 3).

## A.  Procedural History

Direct Purchaser Plaintiffs filed a Consolidated Amended Complaint ("CAC") (Direct [ECF No. 90]) on January 7, 2010; Indirect Purchaser Plaintiffs filed a Second Amended Consolidated Complaint (Indirect [ECF No. 80]) on March 5, 2010.  On March 8, 2010, Defendants in both actions filed identical Motion[s] to Dismiss Amended Complaint[s] (the "MDACs") (Direct [ECF

---

Plaintiffs bring suit as a class under Federal Rule of Civil Procedure 23(a) and (b)(3), seeking to represent a class defined as all persons who indirectly purchased cement or concrete deriving from any of the Defendants between January 1, 2004 and the present.

[7] The Defendants are identified as Cemex Inc. ("Cemex"), a producer and distributor of cement and concrete, having three cement plants, ten cement import terminals, and 71 concrete suppliers in Florida; Cemex Materials, LLC and Cemex Construction Materials Florida, LLC (together "Rinker"), which operated as Rinker in Florida until they were acquired by Cemex in 2007 and which sell cement and concrete in Florida; Preferred Materials, Inc. ("Preferred"), which purchased 21 former Rinker concrete suppliers, five former Cemex concrete suppliers, and six former Rinker concrete block plants to facilitate Cemex's acquisition of Rinker in 2007; Continental Florida Materials ("Continental"), which produces concrete and sells cement and concrete in Florida; Florida Rock Industries, Inc. ("Florida Rock"), which manufactures and sells cement and concrete, and operates one cement plant, two cement import terminals, and 63 concrete suppliers in Florida; and Tarmac America LLC ("Tarmac"), which operates one cement plant, one cement import terminal, and approximately 37 concrete suppliers in Florida; Prestige AB Management Co. LLC ("Prestige"), which manufactures and sells concrete and operates 31 concrete suppliers in Florida; Suwannee American Cement LLC ("Suwannee"), which sells cement and operates one cement plant in Florida; and Votorantim Cimentos North America, Inc. ("VCNA"), which controls at least one cement plant, one cement import terminal, and several concrete suppliers and which conducts its business in Florida through entities which it controls, such as Co-Defendants Prestige and Suwannee.  Plaintiffs also allege there are unnamed co-conspirators who participated in the acts complained of in the DSCAC.

3

No. 147]; Indirect [ECF No. 82]).  On June 18, 2010, Direct Purchaser Plaintiffs dismissed without prejudice their claims against then-Defendant Lafarge North America, Inc. (*see* Notice of Voluntary Dismissal (Direct [ECF No. 196])), and Indirect Purchaser Plaintiffs did the same on June 21, 2010 (*see* Notice of Voluntary Dismissal (Indirect [ECF No. 196])).  On June 22, 2010, the Court held a joint hearing on the MDACs.  (*See* Direct [ECF Nos. 187, 200]; Indirect [ECF Nos. 99, 106]).  At the hearing, the Court expressed concerns about reviewing the sufficiency of a multi-defendant complaint containing allegations of a conspiracy involving a dismissed defendant (*see* Hr'g Tr. 118:14-119:5 (Direct [ECF No. 202])), and directed both the Direct and Indirect Purchaser Plaintiffs (collectively, "Plaintiffs") to amend their complaints (*see id.* 118:14-122:19).  The Court then denied the MDACs as moot.  (*See* Direct [ECF No. 201]; Indirect [ECF No. 107]).

In compliance with the Court's instructions, Direct Purchaser Plaintiffs filed the DSCAC on July 12, 2010 (Direct [ECF No. 203]), and Indirect Purchaser Plaintiffs filed the ICTCAC[8] on August 5, 2010 (Indirect [ECF No. 109]).  On August 9, 2010, Defendants in both actions moved to dismiss the newly-amended complaints.

## B.    Factual Background

Between the early 1990s and the early 2000s, the cement and concrete markets in Florida underwent significant consolidation as Defendants[9] acquired cement and concrete suppliers.  (*See*

---

[8]  The ICTCAC made minor changes to the Third Amended Consolidated Complaint [ECF No. 108], which had been filed on July 12, 2010.

[9]  Plaintiffs use the undifferentiated term "Defendants" throughout the DSCAC.  Sometimes it is evident they mean either all of the Defendants or only some of the Defendants, but many times it is not clear whether all Defendants or some Defendants are intended.  Rather than continue to struggle with the context to distinguish each occurrence, in this Order the Court also uses "Defendants" throughout.

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

DSCAC ¶ 81). Defendants' large investments in Florida were made, in part, to participate in the commercial construction boom which occurred during those years. (*See id.* ¶¶ 81–82).

In 2004, starts of new commercial construction projects began to decline, while the residential construction boom (i.e., the housing bubble) continued to grow. (*See id.*). Before this point, smaller construction projects, such as residential projects, were typically served by the ICPs. (*See id.*). But in the face of the decline in commercial construction, Defendants sought out these smaller projects. (*See id.*).

In 2004 and 2005, statewide cement shortages began to occur. (*See id.* ¶¶ 84, 110). Defendants shut down cement factories, which reduced the amount of cement available to ICPs for purchase. (*See id.* ¶¶ 84, 107–110). Around the same time, Defendants began to engage in a series of parallel price increases for the cement that remained for the ICPs to buy. (*See id.* ¶ 104). Also in 2004 and 2005, a shortage of concrete block developed in the Orlando area (*see id.* ¶ 111), which led Defendants to begin requiring construction companies that wanted to purchase concrete block from any Defendant to purchase ready-mix concrete from that Defendant as well (*see id.* ¶ 113).

Around 2005, sales of cement and concrete began to decline. Then in 2007 and 2008, when the housing bubble burst, demand dropped precipitously. (*See id.* ¶¶ 86, 175). Nevertheless, during this time, the market price of cement and concrete remained stable or continued to rise. (*See id.* ¶¶ 86, 102, 104, 175). Moreover, between 2005 and 2007, the consolidation trend continued as several Defendants expanded their concrete operations by acquiring ICPs. (*See id.* ¶ 85).

Plaintiffs allege that these price increases, the cement and concrete shortages, and Defendants' increased activity directed at the ICPs, all occurred pursuant to an unlawful price-fixing

agreement between Defendants. (*See id.* ¶ 5). Plaintiffs allege Defendants accomplished their price fixing by: (1) coordinated price increases for cement and concrete; (2) artificial shortages of cement; (3) coordinated block supply restrictions and tying; (4) the allocation of customers among Defendants; (5) the allocation of geographic areas among Defendants; and (6) swaps of cement settled up at below-market prices. Additionally, Plaintiffs allege certain statements made by Jorge Wagner ("Wagner"), the President of Prestige since late-2007 or early-2008, and Michael Lane ("Lane"), a former General Manager of Prestige, provide direct evidence of the existence of an unlawful agreement. In order to bolster the plausibility of the conspiracy, Plaintiffs also allege certain features of the cement and concrete markets in Florida, which make those markets susceptible to collusion.

### 1.     Coordinated Price Increases for Cement and Concrete

Defendants engaged in parallel price increases for both cement and concrete throughout the Class Period, which set and maintained artificially high prices for both products. (*See id.* ¶ 100). For example, in the summer of 2008, as the housing market collapsed, the country plunged into a recession, and demand for concrete dropped, certain Defendants each announced very similar 30 percent increases in the price of concrete. (*See id.* ¶ 102). On August 4, 2008, Cemex announced it would increase its concrete price by $25 per cubic yard and eliminate its fuel surcharge. (*See id.* ¶ 102(a)). Shortly thereafter, Prestige President Wagner, recently arrived from one of Prestige's parent companies, Votorantim Group, announced to his sales staff that Prestige would also be increasing its ready-mix concrete price by $25 per cubic yard, and that Prestige's competitors had agreed to go along with the increase. (*See id.* ¶ 102(b)). The source of this information, according

to Wagner, was Cemex.  (*See id.*).  Sales personnel present at the meeting were well-aware that Prestige's most significant competitors in Florida at the time were Cemex, Tarmac, and Florida Rock.  (*See id.*).  Wagner also stated Prestige sales staff who quoted customers less than the $25 per cubic yard price increase would be fired.  (*See id.*).  Before this meeting, Prestige had been drafting price increase letters announcing a smaller $5 per cubic yard increase.  (*See id.*).  In August and September of 2008, Tarmac, Florida Rock, and Prestige each announced concrete price increases nearly identical to Cemex's.  (*See id.* ¶¶ 102(c)-(e)).  In addition to Prestige, other VCNA concrete producers in Florida also followed this increase.  (*See id.* ¶ 102(e).)

Throughout the Class Period, Defendants repeatedly engaged in parallel price increases for both cement and concrete, raising prices approximately twice per year.  (*See id.* ¶ 104).

### 2.  Shortages of Cement

In 2004 and 2005, Defendants caused shortages of cement to occur.  In spring 2004, Tarmac temporarily closed its Pennsuco, Florida plant to resolve a mechanical problem.  (*See id.* ¶ 107).  The problem allegedly took six months to fix, much longer than typically necessary.  (*See id.*).  While the Tarmac plant was closed, Rinker, Florida Rock, and Suwannee also shut down their plants for scheduled maintenance during the spring and summer — the peak building months of the year.  (*See id.* ¶ 108).  These combined shutdowns reduced cement production capacity by about 33 percent for much of the second half of 2004.  (*See id.*).  Defendants, including Florida Rock, Cemex, Rinker, and Suwannee, created a similar shortage during the peak season in 2005 by simultaneously taking their cement plants offline for cleaning.  (*See id.* ¶ 109).

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

These shortages allowed Defendants to rapidly increase cement prices; four price increases came into effect between July 1, 2004 and July 1, 2005. (*See id.* ¶ 110). Defendants also reduced cement supplies to ICPs, diminishing the ICPs' ability to produce and sell concrete in competition with Defendants. (*See id.*). For example, in the summer of 2004, Florida Rock allocated Home Building Materials, Inc., an ICP operating out of St. Petersburg, Florida, less cement than it needed. (*See id.*).

### 3.    Coordinated Block Supply Restrictions and Tying

In or about 2004 and 2005, there was a purported shortage of concrete block in the Orlando area, which Cemex, Florida Rock, Rinker, and Tarmac claimed was due to a global shortage of cement. (*See id.* ¶ 111). This shortage was either created or exacerbated because Defendants reduced production hours at their block plants — a departure from their past practices. (*See id.*). Using the block shortage as an excuse, Cemex, Florida Rock, Rinker, and Tarmac each approached construction companies, including customers of ICPs, and told them that if the customers did not purchase their ready-mix concrete from that Defendant, the Defendant would not sell the customers concrete block. (*See id.* ¶ 113). Customers who would otherwise purchase ready-mix concrete from an ICP, but who also needed concrete block, had no alternative but to buy both products from one of the Defendants. (*See id.*). Furthermore, these Defendants were able to sell concrete block itself at inflated prices due to the purported shortage. (*See id.*).

During the concrete block shortage, Morgan Construction was purchasing block from Rinker[10] at $1.25/block, even though the market price rose as high as $2.25/block. (*See id.* ¶ 114).

---

[10]   The Response notes this was before Cemex purchased Rinker. (*See* Resp. 15 (Direct [ECF No. 212])).

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

But when Rinker would not commit to meeting all of Morgan Construction's concrete block needs, Morgan Construction investigated and discovered it could purchase block from an independent producer in Alabama for $0.75/block and ship it to Florida for $0.50/block, for a total cost of $1.25/block — equal to what Rinker charged for Florida manufactured block. (*See id.* ¶ 115). When Rinker learned Morgan Construction was importing block to meet its needs, Rinker cut off its sales of concrete block and ready-mix concrete to Morgan Construction. (*See id.* ¶ 116). Morgan Construction was unable to obtain block at competitive prices from Cemex or Florida Rock. (*See id.*).

Morgan Construction turned instead to Prestige, which had not yet been acquired by VCNA and had not yet built its own block manufacturing plant. (*See id.* ¶ 117). Prestige also needed block because its concrete customers were being coerced into leaving Prestige by the other Defendants' practice of tying block and concrete purchases together. (*See id.*). Morgan Construction and Prestige entered into a contract under which Prestige supplied Morgan Construction with ready-mix concrete, and Morgan Construction supplied Prestige with block shipped from Alabama. (*See id.* ¶ 118). Later, Prestige itself sourced block from Georgia and North Carolina for $0.75 to $0.85/block. (*See id.*). After Morgan Construction and Prestige established an independent supply of block in the Orlando area, the two-year shortage of block ended. (*See id.* ¶ 120). As a result, around the end of 2005 or early 2006, the price of block dropped around 30 percent, from $1.25/block to between $0.80 and $0.90/block. (*See id.*).

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

**4.     Allocation of Customers Among Defendants**

Throughout the Class Period, but particularly after the sharp drop in demand following the burst of the housing bubble in 2007 and 2008, Defendants refrained from competing among themselves for cement and concrete customers. (*See id.* ¶¶ 121-22, 128). This allowed Defendants to inflate prices. (*See id.* ¶¶ 122, 128).

Plaintiffs allege several instances where Defendants declined to compete for each other's customers. (*See id.* ¶¶ 123-24, 127, 129). For example, Plaintiff CCA, one of Florida's largest concrete purchasers, was a Rinker customer from at least 1990 until this past year. (*See id.* ¶ 124). Every year or two, CCA's purchasing director contacted Florida Rock and Tarmac — Rinker's competitors in the region that could provide the volume of concrete CCA required — and sought better prices for concrete. (*See id.*). But when they learned CCA was supplied by Rinker, Tarmac refused to offer a price and Florida Rock offered a non-competitive price. (*See id.*).

In another example, when an employee of Superior Concrete called Florida Rock to place a cement order, the sales representative replied that Florida Rock had product available to sell but also asked the Superior employee to identify its current supplier. (*See id.* ¶ 129(b)). When the employee identified Rinker as the supplier, the Florida Rock sales representative referred him to a Florida Rock regional sales manager. The regional sales manager told the Superior Concrete employee that Florida Rock either did not have product to sell or that Florida Rock's price was higher than the sales representative had quoted. (*See id.*). This forced Superior to continue purchasing cement from Rinker. (*See id.*). Other ICPs who tried to change suppliers or seek competitive bids had similar experiences. (*See id.* ¶¶ 129(a), (c)).

10

In at least one situation, a Defendant pursued a customer until it discovered the customer was already being supplied by another Defendant.  In early 2009, Cemex sales representatives approached a construction site in Oxford, Florida they thought was supplied by an ICP.  (*See id.* ¶ 123).  The Cemex representatives had the intention of underbidding the ICP and acquiring new business for Cemex.  (*See id.*).  When they learned that the job was being handled by Florida Rock, rather than by an ICP, the sales representatives were instructed by Cemex not to compete for the project.  (*See id.*).

In a fall 2008 meeting in the company's Orlando offices, Prestige President Wagner told Prestige sales personnel and senior management that, pursuant to an arrangement with Cemex, the two companies were not to compete for each other's existing customers.  Wagner also said employees who did not adhere to this agreement would be fired.  (*See id.* ¶ 125).

In March 2009, Prestige sales representatives discovered Cemex had offered Lennar Homes, a major national homebuilder and Prestige customer, a lower price than the one quoted by Prestige.  (*See id.* ¶ 127).  The salesmen reported this exchange to Wagner, who complained that Cemex could not do that, and that it was not what they had agreed on.  (*See id.*).  Wagner ordered Prestige representatives to retaliate by "stealing" a Cemex customer.  This was a departure from existing instructions to the Prestige sales staff not to undercut Cemex's prices or to compete for Cemex customers.  (*See id.*).  Per Wagner's instructions, the sales representatives contacted GC Contracting, a Cemex customer, and offered it favorable pricing.  (*See id.*).  Shortly before a deal with GC Contracting was finalized, Wagner ordered the Prestige representatives to withdraw their low offer and to quote a noncompetitively high price.  (*See id.*).  Shortly thereafter, Cemex reneged on its bid

to Lennar Homes. (*See id.*). Consequently, Lennar Homes continued to purchase from Prestige, and GC Contracting continued to purchase from Cemex. (*See id.*)

### 5.   Allocation of Territories Among Defendants

Defendants refrained from competing for business in each other's "territories," ensuring they could each raise prices in their own territories. (*See id.* ¶¶ 130-35). For example, Cemex controls concrete sales in the Florida Keys (the "Keys") — and due to the lack of competition, is able to charge prices up to 70 percent higher than the already inflated prices in the rest of the State. (*See id.* ¶ 132). In 2008, Advantage Concrete tried to supply mobile-mix concrete to the Keys. It sought out a cement supplier in Miami and a trucking company to transport cement from Miami to the Keys. (*See id.* ¶¶ 133-34). Advantage Concrete approached Tarmac, Continental, and Cemex, each of which sell cement in the Miami area, and all three quoted a price at least $20 per ton above the going rate when they learned the cement was bound for the Keys. (*See id.* ¶ 133). When Advantage Concrete approached trucking companies, they all declined to haul the loads or quoted prices significantly higher than the distance to the Keys merited. (*See id.* ¶ 134). One independent trucker told Advantage Concrete if it hauled cement for Advantage Concrete to the Keys, it would not be given any more work by the major Cement producers. (*See id.*). As a result, Advantage Concrete was unable to gain a foothold in the Keys, and Cemex maintained its hold over the region. (*See id.*).

Advantage Concrete also encountered problems in 2004 and 2005 when it tried to supply mobile-mix concrete[11] to the Okeechobee area where Cemex had a plant (*See id.* ¶ 135). A

---

[11]  Mobile-mix trucks carry the ingredients for concrete to a job site separately and mix them on location. Because mobile-mix trucks mix concrete on site, their range is not restricted by the need to deliver concrete from a batch plant to a job site before the concrete hardens. The cost to transport cement itself still limits the range in which mobile-mix trucks are used.

construction company was using large volumes of concrete for a series of projects in the region, and Advantage Concrete planned to send its mobile-mix trucks to Okeechobee to meet the increased demand for concrete. (*See id.*). Yet when Advantage Concrete tried to purchase cement from Tarmac for delivery to Okeechobee, Tarmac quoted a price of $140 per ton instead of the $100 per ton it quoted on other deliveries of the same distance. (*See id.*). As a result, Advantage Concrete could not compete with Cemex for many of the Okeechobee projects and was limited to projects for which it could supply cement out of its Melbourne, Florida location. (*See id.*).

Defendants also targeted ICPs' customers within identified geographic regions. For example, in September 2009, Cemex, Florida Rock, Tarmac and Prestige reduced their concrete prices by $4–5 per cubic yard for ICP customers — but not for each other's customers. (*See id.* ¶ 130). Each Defendant only targeted ICP customers in a specific region: Cemex targeted ICP customers in the southern coastal and central regions; Florida Rock targeted ICP customers in the Jacksonville area; Tarmac targeted ICP customers on the Gulf Coast; and VCNA targeted ICP customers in the Orlando area. (*See id.*). This allowed each Defendant to expand its market share and eliminate ICP competition without competing against the other Defendants.

### 6.    Cement Swaps Settled Below Prevailing Prices

Plaintiffs also allege Defendants have engaged in cement swaps to further their conspiracy to fix prices. In this case, a cement swap is an agreement between two Defendants to exchange a certain amount of cement during a fixed period of time.[12] Swaps are often entered between Defendants when a ready-mix customer purchases from one Defendant whose ready-mix batch plant

---

[12] The details of these arrangements are discussed in the analysis section.

is closer to a second Defendant's cement plant than it is to its own.  (*See id.* ¶ 137).  Rather than

transport the cement it needs from its own cement plant to its ready-mix batch plant, the first

Defendant obtains the cement it needs from the second Defendant's plant.  (*See id.* ¶¶ 136–38).  In

exchange, the first Defendant promises to give the second Defendant an equal amount of cement at

a later date.  (*See id.* ¶¶ 138).  Because the Defendants typically do not swap precisely equal amounts

of cement with each other, they periodically settle up the differences by cash payment.  (*See id.* ¶

139).  These settle-up prices are far below — as little as one half — the market rates charged to ICPs.

(*See id.* ¶¶ 139–41, 144).  According to Plaintiffs, the manner in which these swaps are executed

would be against the self-interest of the individual Defendants unless there was an unlawful

agreement among them.

### 7.    The Lane Allegations and Prestige's Cover-Up

In February 2009, Michael Lane, General Manager of Prestige's concrete block division,

reported some of Prestige's conduct to the U.S. Department of Justice and Prestige's general counsel.

(*See id.* ¶ 146; Resp. 48).  Lane expressed concerns about antitrust violations in the Florida cement

and concrete market.  (*See* DSCAC ¶ 146).  This led Prestige to begin an internal investigation.  (*See

id.* ¶ 147).

Around May 2009, Lane was placed on administrative leave, purportedly for a failure to

obtain approval for prices he had charged on certain products.  (*See id.* ¶ 149).  He was forbidden

to speak with any Prestige staff, customers, or suppliers.  (*See id.*).  Shortly thereafter, Lane resigned.

(*See id.*).  Lane asked Prestige to return his personal computer, on which he had stored evidence of

Defendants' illegal price-fixing and anticompetitive conduct, including admissions of price-fixing

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

by Prestige President Wagner. (*See id.* ¶ 150). Prestige did not return Lane's computer, its contents, or any of the other materials Lane had collected documenting Defendants' conspiracy. (*See id.*). Shortly after these events, Prestige's general counsel, who had been in charge of the company's internal investigation, left Prestige. (*See id.* ¶ 151).

### 8.    Additional Factors

Plaintiffs describe characteristics of the cement and concrete markets in Florida which they contend increase the plausibility Defendants have conspired to fix cement and concrete prices. (*See id.* ¶ 154). First, the cement and concrete markets in Florida are highly concentrated and controlled by a small number of companies, namely the Defendants. (*See id.* ¶¶ 155–57). Second, these markets have high barriers to entry because of the high start-up costs for cement plants, concrete batch plants, and ready-mix trucks, among other things. (*See id.* ¶¶ 158–61). Third, demand for cement and concrete is not sensitive to changes in price because customers cannot turn to cheaper substitute products of similar quality. (*See id.* ¶¶ 162–64). Fourth, cement and concrete are both standardized products — that is, the cement or concrete from one producer is interchangeable with that of another. (*See id.* ¶¶ 169–70). Fifth, even though demand for cement and concrete in Florida has been declining, prices have remained stable or increased. (*See id.* ¶¶ 171–73). Sixth, Defendants interact with each other in multiple markets. (*See id.* ¶ 183). Plaintiffs contend that these market features make the Florida cement and concrete market susceptible to anticompetitive conduct and unlawful collusion.

15

**C.      The Motions to Dismiss**

Defendants move to dismiss the DSCAC and the ICTCAC pursuant to Federal Rule of Civil Procedure 12(b)(6) and 9(b) primarily on the grounds that Plaintiffs do not plead enough facts to support a plausible inference of conspiracy.  (*See* Mot. 1).

## II.  LEGAL STANDARD

The premise of Defendants' Motions is the pleading standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and further clarified in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2007).  Recently, in *Am. Dental Assoc. v. CIGNA Corp.*, 605 F.3d 1283 (11th Cir. 2010), the United States Court of Appeals for the Eleventh Circuit summarized the Supreme Court's move from the "no set of facts" pleading standard long-followed under *Conley v. Gibson*, 355 U.S. 41 (1957), to a more exacting standard that requires a complaint to contain sufficient factual matter to "state a claim . . . plausible on its face." *Twombly*, 550 U.S. at 570.  As the Eleventh Circuit explained:

> Fed. R. Civ. P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957).  In *Twombly*, the Supreme Court expressly "retired" the "no set of facts" pleading standard under Rule 8(a)(2) that the Court had previously established in *Conley v. Gibson*. *Twombly*, 550 U.S. at 563, 127 S. Ct. at 1969.  Justice Black wrote for the Court in *Conley* of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle[] him to relief." 355 U.S. at 45–46, 78 S. Ct. at 102.  In rejecting that language, the Court in *Twombly* noted that courts had read the rule so narrowly and literally that a "wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." 550 U.S. 561, 127 S. Ct. at 1968 (internal quotation marks and alterations omitted).
>
> In *Twombly*, the plaintiffs alleged an antitrust conspiracy among certain regional telecommunications providers in violation of the Sherman Act, 15 U.S.C.

§ 1 (2006). *Id.* at 550, 127 S. Ct. at 1962. Their complaint relied on allegations of the defendants' parallel behavior to allege the conspiracy. *Id.* The Supreme Court granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct. *Id.* at 553, 127 S. Ct. at 1963. Justice Souter, writing for a substantial majority, first noted:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id.* at 555, 127 S. Ct. at 1964–65 (internal quotation marks, citations, and alterations omitted). The Court explained that "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 127 S. Ct. at 1965. The Court ultimately held that to survive a motion to dismiss, a complaint must now contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570, 127 S. Ct. at 1974. Cautioning that its new plausibility standard is not akin to a "probability requirement" at the pleading stage, the Court nonetheless held that the standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Id.* at 556, 127 S. Ct. at 1965. The Court was careful to note that "we do not require heightened fact pleading of specifics," but concluded that when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570, 127 S. Ct. at 1974. Finding that the plaintiffs' complaint did not plausibly suggest an illegal conspiracy by merely alleging parallel conduct – because such parallel conduct was more likely explained by lawful, independent market behavior — the Court held that the district court properly dismissed the complaint. *Id.* at 567–70, 127 S. Ct. at 1972–74.

The Supreme Court has since applied the *Twombly* plausibility standard to another civil action, *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

\*                    \*                    \*

In evaluating the sufficiency of Iqbal's complaint in light of *Twombly*'s construction of Rule 8, the Court explained the "working principles" underlying its decision in that case. *Id.* at 1949. First, the Court held that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Second, restating the plausibility standard, the Court held that "where the well-pleaded facts do not permit the court to infer more than the mere

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

possibility of misconduct, the complaint has alleged — but it has not 'show[n]' —
'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting FED. R. CIV. P. 8(a)(2)).
The Court suggested that courts considering motions to dismiss adopt a "two-
pronged approach" in applying these principles: 1) eliminate any allegations in the
complaint that are merely legal conclusions; and 2) where there are well-pleaded
factual allegations, "assume their veracity and then determine whether they plausibly
give rise to an entitlement to relief." *Id.* Importantly, the court held in *Iqbal*, as it
had in *Twombly*, that courts may infer from the factual allegations in the complaint
"obvious alternative explanation[s]," which suggest lawful conduct rather than the
unlawful conduct the plaintiff would ask the court to infer. *Id.* at 1951–52 (quoting
*Twombly*, 550 U.S. at 567, 127 S. Ct. at 1972).

*Am. Dental Assoc.*, 605 F.3d 1283, at 1288–90 (some alterations added).

## III.  ANALYSIS

In the Motions to Dismiss, Defendants contend: (1) the allegations of Defendants' parallel
conduct do not give rise to a plausible inference of a conspiracy; (2) no additional facts are pleaded
placing the alleged parallel conduct in a context that raises a plausible suggestion of a preceding
agreement; and (3) the alleged conspiracy is inherently implausible. (*See* Mot. 2–5). Additionally,
Defendants ask that all claims regarding conduct occurring before October 22, 2005 and November
16, 2005 be dismissed because they fall outside the Clayton Act's four-year statute of limitations and
are not entitled to equitable tolling. Defendants also contend the Indirect Purchaser Plaintiffs'
Complaint should be dismissed for a number of other reasons. The Court begins its discussion with
the first argument (failure to plead facts plausibly suggesting a conspiracy) because a negative
finding on this issue would be dispositive.

Direct and Indirect Purchaser Plaintiffs (collectively, "Plaintiffs") allege that since 2004
Defendants have conspired to fix, raise, stabilize or maintain prices of and allocate customers and
markets for Portland cement, ready-mix concrete, and concrete block in the State of Florida in

violation of section 1 of the Sherman Act.  Indirect Purchaser Plaintiffs also plead a claim for

damages under the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), Fla. Stat.

§§ 501.201–23.  Direct Purchaser Plaintiffs seek damages and injunctive relief pursuant to the

Clayton Act, 15 U.S.C. §§ 15, 26.  Indirect Purchaser Plaintiffs seek injunctive relief pursuant to the

Clayton Act, 15 U.S.C. § 26 and damages under the FDUTPA, Fla. Stat. §§ 501.201–23.  The

existence of a section 1 conspiracy to fix prices is relevant to the claims of both sets of Plaintiffs and

is addressed first based on the allegations contained in the DSCAC.  The Indirect Purchaser

Plaintiffs' FDUTPA claim follows and the specific allegations contained in the ICTCAC are

considered at that point.  It is important to note in order to ensure the parties' arguments are fully

addressed, the allegations are grouped and considered under headings similar to those provided by

the parties; however, the Court is mindful of the Supreme Court's instruction with regard to a

summary judgment analysis in the price-fixing context, that Plaintiffs are entitled to "'the full benefit

of their proof without tightly compartmentalizing the various factual components and wiping the

slate clean after scrutiny of each.'"  *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F.

Supp. 2d 1253, 1268 (N.D. Ga. 2002) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,

370 U.S. 690, 699 (1962)).

## A.     The Price-Fixing Conspiracy

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy,

in restraint of trade or commerce."  15 U.S.C. § 1.  There are different formulations of what a

plaintiff must allege to state a claim under section 1.  In the Sixth Circuit, for example, a plaintiff

must allege

(1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects; (3) within relevant product and geographical markets; (4) that the objects of and conduct pursuant to that contract or conspiracy were illegal; and (5) that the plaintiff was injured as a proximate result of that conspiracy.

*Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 617 (6th Cir. 1993) (quoting *Int'l Logistics Grp., Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989)).  In the Ninth Circuit, a plaintiff must allege (1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a *per se* or rule-of-reason analysis; and (3) the restraint affected interstate commerce.  *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996); *see also Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001).  Under any formulation of the necessary elements of a section 1 cause of action, a plaintiff must allege the existence of a conspiracy.  "'The crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit[13] or express[.]'" *Twombly*, 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (alteration added).

In the Motions to Dismiss, Defendants contend Plaintiffs do not adequately allege an antitrust conspiracy because they neither allege facts sufficient to establish the non-inferential existence of an illegal agreement nor facts sufficient to support a reasonable inference such an agreement existed.

---

[13] It is curious that "tacit agreement" snuck its way into the *Twombly* decision.  Tacit agreement in an oligopoly is simply conscious parallelism, which the Supreme Court spent much of the *Twombly* decision describing as perfectly normal and not a violation of section 1.  Section 1 of the Sherman Act does not reach "tacit agreement;" there must be an express preceding agreement in order for there to be a contract, combination, or conspiracy in restraint of trade.  "The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1." *Twombly*, 550 U.S. at 554 (quoting VI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1433a, at 236 (2d ed. 2003)).

(*See* Mot. 18).  To survive a motion to dismiss a section 1 claim, a plaintiff must allege  "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Moreover, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id*. at 557.  Factual allegations that are "consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy" are insufficient.  *Id*. at 554.  Factual allegations must not only be consistent with an inference of conspiracy but also must be "suggestive enough to render a . . . conspiracy plausible" and must "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id*. at 556.  The Court "may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Iqbal* at 1951–52 (quoting *Twombly*, 550 U.S. at 567).  After *Twombly*, to successfully plead a section 1 claim based on defendants' conduct alone, plaintiffs must allege facts that make the existence of a preceding unlawful agreement the most plausible explanation for defendants' behavior.

The DSCAC concludes that since 2004 Defendants have conspired to fix, raise, stabilize or maintain prices of, and allocate customers and markets for, cement, ready-mix concrete, and concrete block in Florida in violation of section 1 of the Sherman Act.  To support this conclusion, Plaintiffs first allege a wide range of conduct from which they maintain the existence of an illegal agreement can be inferred, and second, allege statements made by Wagner and Lane which Plaintiffs contend directly show an illegal agreement.  The allegations of suggestive conduct, "viewed in light of

common economic experience," *Twombly*, 550 U.S. at 565, are considered first, then the statements made by Wagner and Lane.

### 1.      Coordinated Price Increases

Plaintiffs allege Defendants engaged in parallel increases of concrete and cement prices throughout the class period.  First, certain Defendants raised their price of cement "by about the same amount and at about the same time" on at least seven occasions between 2004 and 2009.  (DSCAC ¶¶ 101, 104).  Plaintiffs contend these parallel price increases suggest the existence of a conspiracy.  However, Plaintiffs' description of these cement price increases as parallel must be heavily qualified.  For example, each cement price increase is alleged to have been followed by only three or four Defendants at a time; the price increases were sometimes announced many months apart; and the amounts sometimes differed, if only by small amounts.  (*See id.* ¶ 104).  Second, Plaintiffs allege only a single instance of parallel concrete price increases, which occurred in 2008.  (*See id.* ¶¶ 102–03).  There, certain Defendants over a period of six weeks, led by Cemex on August 4, 2008, announced large, nearly identical price increases for concrete along with the elimination of fuel surcharges.  (*See id.*).  These changes were to all take effect within two weeks of each other in September and October of 2008.  (*See id.*).

To the extent these increases do show parallel conduct, "[w]ithout more, parallel conduct does not suggest conspiracy."  *Twombly*, 550 U.S. at 556–57.  This is because, as Defendants contend and as the Supreme Court observed in *Twombly*, Defendants' conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by

common perceptions of the market."[14]  550 U.S. at 554.  Many courts have found in concentrated

industries like the one Plaintiffs allege here, conscious parallelism and follow-the-leader pricing

"typically result from firms' rational recognition that the market structure [oligopoly] in which they

operate will most easily yield profits by means other than price competition."  *Williamson Oil Co.*

*v. Philip Morris USA*, 346 F.3d 1287, 1299 (11th Cir. 2003); *see also*, *In re Travel Agent Comm'n*

*Antitrust Litig.*, 583 F.3d 896, 910 (6th Cir. 2009) ("'[A] firm in a concentrated industry typically

has reason to decide (individually) to copy an industry leader . . . . One does not need an agreement

to bring about this kind of follow-the-leader effect in a concentrated industry.'") (quoting *Reserve*

*Supply Corp. v. Owens Corning Fiberglas Corp.*, 971 F.2d 37, 53 (7th Cir. 1992)).[15]

---

[14]  Actually, Defendants' conduct depends on their perceptions and observations of each other.  The Supreme Court does not differentiate companies' parallel reactions to a common stimulus (such as an increase in price of a production input) from consciously parallel reactions to each other, such as price following.  *See* Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 307, at 69 (2d & 3d ed. Supp. 2010).  There is a fundamental difference between all producers raising their prices because production has become more expensive for each of them and producers raising their prices because one of them did; all things being equal, in the first situation, the price will tend toward the non-cooperative oligopoly price, which is known as the Cournot price, while in the second it will tend toward the monopoly price.  *See* Herbert Hovenkamp, FEDERAL ANTITRUST POLICY §§ 4.2–4.3 , at 159–66 (3d ed. 2005).  However, the Supreme Court stated in *Twombly* that this special type of interdependent or conscious parallelism is perfectly consistent with legitimate business conduct.  550 U.S. at 553–54.

[15]  "One would ordinarily expect parallel pricing in . . . [a highly concentrated market], particularly if it is sequential — that is, if each firm is able to observe the prices of others before setting its own price.  Of course, if prices are publicized simultaneously, as in a sealed bid auction, then identical prices become far more suspicious."  H. Hovenkamp § 4.5, at 176.  Here, the price announcements as alleged by Plaintiffs were always sequential and public — suggesting conscious parallelism rather than prior agreement.

        Whether it is good policy to permit this type of price following is another question.  If firms in an oligopoly made production decisions based on their own marginal cost and marginal revenue curves (like in a competitive market) rather than pricing decisions based on prices announced by other firms, the result would tend toward the Cournot price and supply.  The Cournot price is above the competitive price, but below the monopoly or cartel price, and correspondingly, the Cournot supply is below the competitive supply but above the monopoly or cartel supply.  In an oligopoly, making *pricing decisions* based on price announcements by competitors rather than *production decisions* based on marginal cost and marginal revenue, results in higher prices and lower supply.  Courts have consistently found that price following is

23

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

Defendants in this case were, as Plaintiffs allege, in concentrated markets for cement and concrete. (*See id.* ¶¶ 156–57). The price increases alleged by Plaintiffs were announced sequentially, which, although consistent with conspiracy, is more indicative of consciously parallel follow-the-leader pricing. Because there is an obvious lawful alternative explanation for Defendants' coordinated price increases, no unlawful conspiracy to fix prices may be plausibly inferred from these allegations of interdependent parallel conduct. *See Twombly*, 550 U.S. at 557 ("An allegation of parallel conduct . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'" (citations omitted) (alteration in original)).

**2.     Cement Supply Restrictions**

Plaintiffs allege Defendants created artificial cement shortages during the peak building seasons in 2004 and 2005 to support the four parallel cement price increases announced in that period. (*See id.* ¶¶ 106–09). In the spring of 2004, Tarmac closed one of its cement plants for six months to repair a mechanical problem. (*See id.* ¶ 107). While it was closed, three of the other four Defendants with cement plants in Florida at the time shut down some plants for scheduled maintenance. (*See id.* ¶ 108). Then in the summer of 2005, four Defendants simultaneously took cement plants offline for 21 to 28 day cleaning cycles. (*See id.* ¶ 109).

---

rational and natural in a concentrated market and therefore, have approved it; but entering an agreement to fix prices is also rational and natural — it is just illegal. All things being equal, an antitrust policy which permits price following in an oligopoly will result in higher prices and lower supply than in a non-cooperative oligopoly where firms make production decisions based on whether they will make more money by producing more. *See generally* H. Hovenkamp §§ 4.2–4.4, at 159–73.

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

Plaintiffs maintain these shutdowns were contrary to the interests of the individual Defendants because no rational cement manufacturer would schedule maintenance during peak demand, and therefore these were unusual shutdowns indicative of the existence of a price-fixing conspiracy. (*See* Resp. 53; *see also id.* ¶ 108). In support, Plaintiffs rely on *In re Linerboard Antitrust Litig,* 504 F. Supp. 2d 38 (E.D. Pa. 2007)*.* (*See* Resp. 53). In that case, the defendant containerboard manufacturers took unusual, unscheduled "market downtime" lasting several weeks for the stated purpose of reducing inventories, and then increased prices, which, alongside evidence of inappropriate communications, led the court to deny summary judgment for the defendants, *Linerboard*, 504 F. Supp. 2d at 53–61, because "the evidence tend[ed] to exclude the possibility that [the defendants] were acting independently," *id*. at 59 (quoting *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003) (some alterations added)). The *Linerboard* decision specifically distinguished "market downtime" from "maintenance downtime," *id*., and highlighted that the contemporaneous market downtime taken by two manufacturers was unprecedented. *See id.* at 54 ("Prior to the market downtime at issue in this case, Inland had never taken market downtime in its forty-plus year history . . . . [and] Gaylord took only one brief episode . . . in the 10 years before the market downtime in this case.") (footnote call number omitted).

In the DSCAC, Plaintiffs allege only that some Defendants took downtime for repairs, scheduled maintenance, or cleaning — in other words, "maintenance downtime," and not downtime for the explicit purpose of reducing their inventory or industry inventories. (*See* DSCAC ¶¶ 107–09; *cf. Linerboard*, 504 F. Supp. 2d at 53–54 ). It is not plausible to infer the existence of a prior agreement to fix prices from allegations that, during a six-month period when one Defendant's

25

cement plant was offline for repairs, three other Defendants engaged in regularly scheduled maintenance of their own plants.  A decision to engage in scheduled maintenance is more consistent with independent, rational business conduct than an unlawful agreement to fix prices.

Perhaps recognizing this, Plaintiffs allege the extended repair time, scheduled maintenance, and cleaning were only pretexts for taking the cement plants offline — the true purpose being to reduce supply and raise prices.  (*See* Resp. 53–54; DSCAC ¶ 108).  As Plaintiffs note, in *Linerboard* the defendants offered alternative explanations for the market downtime taken, *see* 504 F. Supp. 2d at 57, 61–62; but the court disregarded those explanations because the plaintiffs provided evidence they were pretextual.  *See id.* at 59, 62.  In this case, Plaintiffs allege the Defendants' maintenance shutdowns were pretextual because in a competitive market it would be irrational for Defendants to schedule cleaning or maintenance of cement plants during peak season.  (*See* Resp. 53–54; DSCAC ¶ 108).  But this begs the underlying question — are the Defendants operating in a competitive market or not?  Absent any factual allegation to support the inference that it is irrational to schedule cement plant maintenance during the spring and summer, the allegation is conclusory.  The cement plant shut downs in 2004 and 2005 do not permit a plausible inference of conspiracy.

### 3.    Non-competition and Territorial Allocation

The DSCAC alleges Defendants allocated customers and territories among themselves to support their efforts to raise cement and concrete prices and to drive ICPs out of the concrete business.  (*See* DSCAC ¶¶ 121–35).  Plaintiffs allege a number of specific instances where one Defendant chose not to compete for another Defendant's customer, or where one Defendant would offer a non-competitive price to provide cement or concrete in an area dominated by another

Defendant.  For the most part, although not uniformly, these actions resemble the conscious parallel decisions not to compete alleged in *Twombly* which the Supreme Court found to be "so natural" and inadequate to support a plausible inference of an unlawful agreement.  550 U.S. at 566 ("[I]f alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.").

To support the allegation Defendants allocated customers, Plaintiffs supply a number of specific examples.  For instance, in early 2009, Cemex, mistakenly believing an ICP was supplying a particular construction site, tried to underbid the ICP; however, when Cemex discovered the concrete was actually being supplied by Defendant Florida Rock, Cemex told its salesman to stop competing for the customer.  (*See* DSCAC ¶ 123).  In another example, when Cemex offered a Prestige customer, Lennar Homes, a lower price for concrete, Prestige retaliated against Cemex by undercutting Cemex's price agreement with GC Contracting.[16]  (*See id*. ¶ 127).  This led Cemex to renege on its agreement with Lennar Homes, and Prestige to increase the low price it had offered GC Contracting to a non-competitively high price.  (*See id*.).  The result was that both Defendants kept their own customers.  (*See id.*).

While these are not the only examples alleged by Plaintiffs where Defendants refused to compete for each other's customers, they are typical.  They are also consistent with legitimate, competitive business behavior in a concentrated market.  As was the case in *Twombly*, each Defendant in this case had a reason for its "competitive reticence," 550 U.S. at 567; Defendants knew aggressively competing for another Defendant's customers would elicit a response — that is,

---

[16]  Wagner's statements with respect to these events are discussed separately below.

they "surely knew the adage about him who lives by the sword," *id*. at 568.  Consequently, the alleged unlawful agreement is not the most plausible explanation for Defendants' parallel decisions not to compete for each other's customers.

Plaintiffs also allege Defendants allocated territories among themselves.  (*See* DSCAC ¶¶ 131–35).  To support this allegation, Plaintiffs describe Advantage Concrete's attempts to compete with Cemex for mobile-mix concrete business in the Keys and in the Okeechobee area.  (*See id.* ¶¶ 132–35).  These attempts were frustrated when several Defendants quoted Advantage Concrete higher prices for cement after they found out where Advantage planned to use it.  (*See id.* ¶¶ 133, 135).  Moreover, the trucking companies Advantage Concrete sought out to carry the mobile-mix concrete to the Keys refused Advantage Concrete's business or demanded prices significantly higher than the distance merited.  (*See id.* ¶ 134).  One of these independent trucking companies explained that if it carried cement to the Keys for Advantage Concrete, it would lose its business from the major cement producers.  (*See id.*).

The statement made by this independent trucking company is troubling, and Defendants do not specifically address it.  While it does make sense that Cemex may refuse to do business with an independent trucking company that carries concrete to the Keys for an ICP, it makes less sense why this would trigger other major cement producers to refuse to work with the company.  This is especially disconcerting because Plaintiffs allege:

> Defendants also monitored the volume of the ICPs' businesses and the locations of the ICPs' jobs.  Such monitoring was accomplished by means which included reviewing bills of lading . . . that were generated when an ICP ordered materials from a Defendant.  Through this means, and by secretly surveilling and following ICPs' trucks to job sites, Defendants were able to keep apprised of the volume of the ICP businesses and locations of the ICPs' jobs.

28

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

(DSCAC ¶ 98).  This type of corporate espionage may be in the independent interest of each Defendant, but when considered alongside the trucking company's fear of collective retaliation, it suggests more than "mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4.  It suggests information sharing and coordination among at least some Defendants.  As permitted by *Iqbal*, the Court has considered alternative explanations that would explain the type of coordinated refusal to deal the trucking company's statement describes[17] — but no obvious alternative explanation is forthcoming.  *See* 129 S. Ct. at 1951–52.  While the trucking company's statement does not describe any actual parallel retaliation by Defendants, the concerns it expresses along with the allegations of monitoring by Defendants form a plausible basis for an inference of an agreement among Defendants.

### 4.    Cement Swap Agreements

The DSCAC alleges Defendants entered cement swap agreements to support supra-competitive prices for concrete and to further their conspiracy to allocate concrete customers and territory.  (*See* DSCAC ¶¶ 142–43).  As Plaintiffs describe, Defendants have batch plants where ready-mix concrete is prepared.  (*See id.* ¶ 137).  Sometimes, one Defendant's ("Def A['s]") ready-mix batch plant is closer to another Defendant's ("Def B['s]") cement plant than to its own cement

---

[17]    Presumably the explanation would go like this: Defendants are all concerned about ICPs competing for ready-mix concrete sales in the regions they dominate. Each Defendant, having identified this problem, separately concludes that if an independent trucker assists an ICP to carry ready-mix concrete into a region dominated by one of its vertically-integrated competitors, it will refuse to use that independent trucker for its own ready-mix transport because it assumes its competitors will, having looked at the market, decide to do the same to help them. This level of strategic behavior sounds implausible even in the context of repeated dealings between Defendants. Morever, it is not clear how this type of coordination could be achieved without Defendants sharing some kind of blacklist that tracked which independent truckers were carrying concrete into what regions for which ICPs, or else by enormous overlapping surveillance efforts by all Defendants.

plant.  (*See id.*).  Because it is expensive to transport cement long distances, Def B agrees deliver

cement to Def A's batch plant in exchange for Def A delivering cement to one of Def B's ready-mix

batch plants in the future.  (*See id*. ¶¶ 137–38).  These exchanges go on for a certain period, at the

end of which, any discrepancies in the volume of cement exchanged between Defs A and B are

settled for a cash price, which is typically well below the published market prices.  (*See id*. ¶ 139).

Plaintiffs contend:

> The fact that the Defendants charge each other a price for Cement below that which
> they charge ICPs demonstrates that the price charged to ICPs is artificially-inflated
> and that each Defendant in the swap is aware of that inflation.  Put another way, if
> the price that the Defendants charged ICPs was one determined by competitive
> market conditions, then that would be the price Def B would charge Def A in the
> swap, and that would be the price Def A would be willing to pay in an arm's-length
> transaction when it comes time to settle any balance owed.

(*Id*. ¶ 140).

Contrary to Plaintiffs' argument, it would actually be against Defendants' self-interests to

set the "settlement price" to the market price.  If the "settlement price" for a swap was the market

price for cement, it would introduce price risk into these agreements, which would complicate the

parties' ability to engage in volume for volume swaps because it would create winners and losers

based on the timing of the settlement.  Moreover, these arrangements have an obvious legitimate

alternative business purpose, which is to reduce transportation costs and allow the Defendants to

charge less for ready-mix concrete.  Plaintiffs acknowledge this when they write, "[b]ecause Cement

is expensive to transport long distances on land . . . Def A routinely arranged a swap with Def B."

(*Id*. ¶ 137).  Moreover, the low "settlement prices" have a legitimate business strategy explanation

as well — the swapping companies arrange the swaps on a volume for volume basis with the goal

of arriving at an equal exchange of cement over a period of time. *See Airweld, Inc. v. Airco, Inc.*, 576 F. Supp. 676, 678 (D. Or. 1983) ("The long-run goal of the swap arrangement is to have all trades come out even, but the arrangement also provides that, in cases of long-run imbalances, accounts will be settled through the use of a 'settlement price.' . . . . An inextricable part of the 'settlement price' was the fact that each party to the agreement could count on the others to provide reciprocal 'swaps' in their market areas. This is why the 'settlement price' was so low . . . . In essence, the 'swaps' were not sales, but trades . . . ."). The existence of an unlawful conspiracy cannot be plausibly inferred from Defendants' use of cement swaps because there are obvious alternative and legitimate explanations for the use of swaps and their settlement pricing.

### 5.  Coordinated Concrete Block Production Restrictions and Tying[18]

Plaintiffs allege that in 2004 and 2005, Cemex, Florida Rock, Rinker, and Tarmac created or exacerbated an artificial shortage of concrete block in the Orlando area, then each Defendant used the shortage as an excuse to limit the sale of concrete block to customers who also purchased ready-mix concrete, that is, Defendants tied the purchase of concrete block to the purchase of ready-mix concrete. (*See* DSCAC ¶¶ 111, 113). According to Plaintiffs, Defendants caused the shortage by reducing production hours at their block plants — a departure from past practice. (*See id.* ¶ 111). Plaintiffs allege this was for the purpose of charging supra-competitive prices for concrete block and increasing Defendants' control over the ready-mix concrete market around Orlando. (*See id.* ¶¶ 111, 113). Plaintiffs also allege this effort was eventually disrupted by Morgan Construction and Prestige

---

[18]  "A tie-in, or tying arrangement, is a sale or lease of one product or service on the condition that the buyer take a second product or service as well." H. Hovenkamp § 10.1, at 397. Plaintiffs do not allege a tying claim in addition to their conspiracy claim.

(before it was acquired by VCNA), when they began importing concrete block from out of state to meet the demand.[19]  (*See id.* ¶¶ 115–20).

First, Plaintiffs allege Defendants claimed the reason for the shortage of concrete block was a global shortage of cement.  This provides an obvious alternative explanation for the reduction of hours at the concrete block plants.  Cement is a component of both concrete block and ready-mix concrete.  In the case of a cement shortage, if a Defendant did not have a sufficient amount of cement to manufacture enough concrete block and ready-mix concrete to satisfy the demand for both, it would have to make input allocation decisions, which may include reducing production hours at a concrete block plant.  Plaintiffs contend, "Defendants' explanation for the block shortage — a global shortage of cement — is belied by the fact that Morgan Construction and Prestige could purchase block from independent producers in [other states]."  (*Id*. ¶ 119).  But this fact only supports the unremarkable conclusion that demand for concrete block and other cement products was lower in the other states.

Second, the ease with which Morgan Construction and Prestige were able to purchase out of state concrete block for prices below the "supra-competitive" price in the Orlando area makes Plaintiffs' allegation of a conspiracy to limit block production in order to raise prices implausible because arbitrage would undermine Defendants' efforts to increase prices.  Indeed, the DSCAC describes how the limited supply of concrete block in the Orlando area led Morgan Construction and

---

[19]  Rinker, which supplied Morgan Construction with some of the concrete block it needed during the shortage, cut off sales of both concrete block and ready-mix to Morgan Construction when it discovered Morgan Construction was importing concrete block from out of state to meet the rest of its needs.  (*See* DSCAC ¶ 116).  In this specific instance, Rinker's actions may more properly be described as imposing a requirement of exclusive dealing on Morgan Construction rather than tying the purchase of block to ready-mix.

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

Prestige to begin sourcing concrete block from hundreds of miles away for resale in Florida, which Plaintiffs conclude eventually drove prices down from a high of $2.25 per block to $0.80 per block.[20] (*See id*. ¶¶ 114–20).   More importantly for the *Twombly* analysis, there is a more plausible explanation for Defendants' decisions to reduce concrete block production — presumably it was more profitable for Defendants to use a limited supply of cement to produce ready-mix concrete instead of concrete block.

Third, Defendants' parallel decisions to link the sale of concrete block to the sale of ready-mix do not suggest a conspiracy.   When there is not enough concrete block to sell to every potential customer, it makes sense for Defendants to condition the sale of block on the purchase of ready-mix concrete in order to reward loyal ready-mix customers.   Faced with more orders for concrete block than they could fill, Defendants needed some way of deciding who would get the block they had. Each could have decided to condition the sale of the block on the sale of ready-mix, either by looking at market conditions or by consciously following the actions of other Defendants.   The allegations of production restrictions and tying do not permit a plausible inference of conspiracy because Defendants' behavior is consistent with independent or consciously parallel business[21] decisions.

---

[20]   This would have also undermined the tying relationships set up by Defendants because it gave purchasers of concrete block a lower cost alternative source of block that was not tied to the purchase of ready-mix.

[21]   In some cases, tying is not a legitimate business practice.   However, Plaintiffs plead no claim for unlawful tying.

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

6.      **Government Investigations**

The DSCAC contains a number of allegations about foreign government and international investigations, and antitrust fines.  (*See* DSCAC ¶¶ 185–93). The Second Circuit recently held in *In re Elevator Antitrust Litigation* that similar allegations could not support an inference of a conspiracy because "[a]llegations of anticompetitive wrongdoing in Europe — absent any evidence of linkage between such foreign conduct and conduct here — is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here.'"  502 F.3d 47, 52 (2nd Cir. 2007). Plaintiffs do not allege any connection between the international investigations and Defendants' conduct alleged in the DSCAC.

In the Response and Plaintiffs' Request for Judicial Notice of Civil Investigative Demands (the "Notice") [ECF No. 213], Plaintiffs highlight the decision of the Florida Attorney General's Office to launch an investigation into this case.  (*See* Resp. 36).  The Attorney General has issued four Civil Investigative Demands ("CIDs") "in the course of an official investigation to determine whether there is, has been or may be a violation of . . . sections 1 or 2 of the Sherman Antitrust Act," or of the Florida Antitrust Act of 1980.  (CIDs [ECF Nos. 213-1–4]).  The CIDs specify they relate to "[p]ossible. . . conspiracies in restraint of trade . . . relating to the cement or concrete industry." (*Id.*).  The first CID was issued to Michael Lane in June 2010; three subsequent CIDs were issued in August 2010 to Jorge Wagner, VCNA,[22] and Prestige.  (*See id.*).  Plaintiffs maintain this investigation bolsters the plausibility of the DSCAC.

_____

[22]  At the hearing, the parties suggested the CID against VCNA has been withdrawn.

The Court need not take judicial notice of these CIDs because they do not make the allegations contained in the DSCAC more plausible.  In *In re Graphics Processing Units Antitrust Litigation*, the "plaintiffs point[ed] out that the Antitrust Division of the Department of Justice [had] served defendants with subpoenas and [was] conducting a grand jury investigation."  527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).  But the court held "[t]he investigation . . . carries no weight in pleading an antitrust conspiracy claim . . . . [because i]t is unknown whether the investigation will result in indictments or nothing at all."  *Id*.  Likewise, in this case, the decision by the Florida Attorney General to investigate one Defendant and one executive of that Defendant does not make the conspiracy alleged in this case more plausible because the outcome of the investigation cannot be predicted.

### 7.    Opportunity to Conspire

Plaintiffs make a number of allegations intended to show Defendants' executives had opportunities to conspire.  For instance, Plaintiffs allege "Defendants frequently communicated through in-person meetings, telephone calls, and other means.  Defendants' meetings in furtherance of the conspiracy included those held at trade association meetings, social events, and corporate meetings." (DSCAC ¶ 89).  Plaintiffs also allege "[e]xecutives employed by Defendants formed close business and personal relationships." (*Id*. ¶ 90).  These allegations do not suggest a conspiracy. "'[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy.'"  *Williamson Oil Co.*, 346 F.3d at 1319 (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991)).  Although it may be impossible to infer a conspiracy unless a complaint alleges some opportunity to conspire, the opportunity to conspire

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

does not on its own or when paired with parallel conduct suggest Defendants entered an agreement to fix prices. *See Twombly*, 550 U.S. at 567 n.12.

### 8.    Other Market Factors

Plaintiffs describe characteristics of the cement and concrete markets in Florida which they contend increase the plausibility Defendants have conspired to fix cement and concrete prices. (*See* DSCAC ¶ 154). For instance, the cement and concrete markets in Florida are controlled by a small number of companies (*see id*. ¶¶ 155–57), and these markets have high barriers to entry because of high start-up costs (*see id*. ¶¶ 158–61). Plaintiffs contend these market features make the Florida cement and concrete market susceptible to anticompetitive conduct and unlawful collusion. (*See id*. ¶ 154). While Plaintiffs are correct, these same market features also make the market susceptible to conscious parallelism. *See, e.g.,* H. Hovenkamp § 4.6a, at 179–80 ("Factors such as high concentration on the seller's side and diffusion on the buyer's side, . . . a standardized product and publicly announced prices and terms, suggest that a market is conducive to express or tacit collusion, as well as non-cooperative oligopoly."). In fact, the market Plaintiffs describe makes cooperative behavior like price following and competitive reticence perfectly rational even in the absence of an agreement. Consequently, none of these features make conspiracy a more plausible explanation than mere interdependence for the parallel conduct alleged by Plaintiffs.

### 9.    Wagner's and Lane's Statements

While parallel conduct, government investigations, and market factors considered alone are insufficient to support a plausible inference of conspiracy, Plaintiffs also allege that statements made by Wagner and Lane provide non-inferential support for an agreement among Defendants. These

36

statements place some of the parallel and other business conduct analyzed above in a context that makes it plausible to infer the existence of an unlawful agreement, at least with respect to some Defendants, and only with respect to concrete in some parts of Florida during some of the class period.

Specifically, in the summer of 2008, after Cemex increased its ready-mix concrete price by $25 per ton, Wagner, the president of Prestige, told the sales staff "that Prestige's competitors had agreed to go along with the increase." (DSCAC ¶ 102(b)). He added that the source of this information was Cemex. (*See id.*). Read in the light most favorable to Plaintiffs, Wagner was reporting Cemex and its competitors had agreed on a $25 per ton increase in the price of ready-mix concrete and Prestige was going along with the agreement. Defendants make three arguments in response.

First, Defendants contend the first statement is vague because it references "Prestige's competitors," and Plaintiffs plead no "facts that would indicate that particular Defendants or specific persons at Defendants entered into an agreement with another specified Defendant at any particular time and place." (Mot. 43). But Plaintiffs assert the audience for Wagner's statement would have understood him to mean Cemex, Florida Rock, and Tarmac.[23] (*See* DSCAC ¶ 26). This is a factual

---

[23] Defendants point to *Twombly's* proposition that "a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin" where the pleadings "furnishe[d] no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place." 550 U.S. at 565, n.10. The Court notes Wagner's statements suggest a rough time frame for the timing of the agreement (sometime before the summer 2008 price increase announcements); they suggest which Defendants were involved (Cemex, Prestige, Florida Rock, and Tarmac); and they suggest Wagner was individually involved in making the agreement. These statements, along with some of the conduct alleged by Plaintiffs, are specific enough to reduce the enormous discovery burden that concerned the Supreme Court in *Twombly*. *See id.* at 558 ("[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery . . . but quite another to forget that proceeding to antitrust discovery can be expensive.") (internal citation omitted).

allegation, and taken as true, it minimizes the vagueness of Wagner's statement.  Second, Defendants contend "Plaintiffs plead no facts placing this purported statement in the context of the other ready-mix concrete price announcements." (Mot. 44).  Defendants point out the timing of Wagner's statement is not pleaded, and he could simply have been observing that Cemex and other ready-mix competitors had already announced price increases of $25 per ton and Prestige would be following those.  (*See id.*).  Defendants explain Wagner's reference to the "source of the information" being Cemex is best read as Cemex having been the price leader for this particular increase.  (*See id.*).  However it would be uncharitable to read Wagner's statements so narrowly — understood in the light most favorable to Plaintiffs, the "information" provided by Cemex was that Cemex and its competitors were going to raise the price of ready-mix by $25 dollars per ton.

Plaintiffs recount another statement made by Wagner in the fall of 2008.  Wagner told Prestige sales personnel and senior management that pursuant to an arrangement with Cemex, the two companies were not to compete for each other's existing customers.  (*See* DSCAC ¶ 125).  Defendants again make two arguments in response.  First, they contend the term "arrangement" is conclusory.  But the allegation in the DSCAC is a description of a statement made by Wagner, not a legal conclusion inferred from other allegations in the DSCAC.  Second, Defendants contend "arrangement" refers to Cemex's and Prestige's independent decisions to refrain from competing with each other in order to avoid a price war.  (Mot. 45).  This requires an unnatural interpretation of the word "arrangement" in the context of an allegation that must be read in the light most favorable to Plaintiffs.  Assuming this allegation to be true, it implies an agreement or understanding between Cemex and Prestige not to compete for each other's customers.

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

This implication is reinforced by a third statement Plaintiffs allege was made by Wagner. According to Plaintiffs, in March 2009, after he was told that Cemex had undercut a Prestige price quote to Lennar Homes, Wagner complained Cemex could not do that because it was not what they had agreed on.  (*See* DSCAC ¶ 127).  Defendants contend Plaintiffs do not purport to quote Wagner and mischaracterize an incident that "just as plausibly could relate to rational independent behavior." (Mot. 46).  Nevertheless, the Court must assume, as Plaintiffs allege, that Wagner made this statement.  The actual content of the statement must be left to the trier of fact.  Taken as true, this statement provides direct support for an agreement between Cemex and Prestige to allocate customers.

Finally, a letter from Lane to the Department of Justice ("DOJ") attached to the DSCAC[24] provides additional factual support for the existence of an unlawful agreement.  In February 2009, Lane, a General Manager at Prestige, wrote to the Department of Justice that he was "of the firm belief that Jorge Wagner our President [sic] has engaged in activity designed to circumvent our countries [sic] trade laws."  (Lane Letter [ECF No. 203-1]).  The letter also mentions there was a "concerted effort along with Cemex," and that Lane was "instructed not to compete for Cemex customers."  (*Id.*).  Defendants maintain nothing in the letter suggests an agreement (*see* Mot 45), but Lane's reference to a concerted effort with Cemex supports the existence of an agreement between Prestige and Cemex.

---

[24]  When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may review any attached or incorporated documents that are central to the plaintiff's claim.  *See Kuehn v. The Cadle Co.*, No. 5:04-CV-432-OC-10GRJ, 2006 WL 845085, *5 (M.D. Fla., March 30, 2006) (citing *Brooks v. Blue Cross & Blue Shield of Fla.*, 116 F.3d 1364, 1368 (11th Cir. 1997)).

### 10.     Summary: The Scope of the Conspiracy

Having reviewed all of the allegations of circumstantial conduct and the allegations directly indicating a conspiracy, Wagner's and Lane's statements, together with certain conduct alleged in the DSCAC, "nudge[ Plaintiffs'] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  However, even though the DSCAC states a claim under section 1, the allegations do not plausibly support the entire statewide, ten-Defendant, two-product conspiracy alleged by Plaintiffs. They support something more modest.  The Supreme Court's decision in *Twombly* is very clear: "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to state a section 1 claim.  550 U.S. at 556.  Plaintiffs declare the conspiracy began in 2004 and continues to the present; however, for the period between 2004 and Wagner's arrival at Prestige, Plaintiffs manage only to allege a few instances of parallel conduct, which are explained by the concentrated nature of the cement and concrete industries in Florida.  For that period, Plaintiffs do not place their "allegations of parallel conduct . . . in a context that raises a suggestion of a preceding agreement." *Id*. at 557.

By contrast, the allegations of parallel conduct upon the arrival of Wagner are set in a context suggesting a preceding unlawful agreement.  Plaintiffs allege that Wagner arrived from Votorantim Group to head Prestige and shortly thereafter made statements suggesting an agreement had been made between Prestige, Cemex, Florida Rock, and Tarmac to raise the price of ready-mix concrete and to refrain from competing with each other's customers.  Plaintiffs allege Prestige, Cemex, Tarmac, and Florida Rock, in accordance with that agreement, all increased the price of ready-mix cement by $25 per ton and eliminated their fuel surcharge in the face of declining demand for ready-

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

mix.  Plaintiffs also describe how in September 2009 these same four Defendants simultaneously

cut their concrete prices by $4–5 per cubic yard to customers of ICPs.  The Plaintiffs also document

specific examples where, after the arrival of Wagner, these four Defendants refrained from

competing for each other's customers and allege in one case, Prestige retaliated against Cemex for

offering a low-bid to a Prestige customer.  Plaintiffs also allege a troubling incident in the spring of

2008, where an independent trucking company refused to help an ICP carry mobile-mix concrete to

the Keys out of fear the major cement producers would refuse to work with it.  This expectation of

collective retaliation is strongly suggestive of a conspiracy.  Finally, Lane's letter to the DOJ

provides further support for an antitrust conspiracy involving Prestige and Cemex following

Wagner's arrival at Prestige.

From these allegations, it is plausible to infer that beginning at about the time of the arrival

of Wagner to head Prestige, Prestige, Cemex, Florida Rock, and Tarmac entered into an agreement

to fix the price of ready-mix concrete[25] in the areas where they sell ready-mix concrete.  Plaintiffs'

allegations do not permit the Court to plausibly infer the alleged conspiracy began before Wagner

arrived at Prestige or to infer the conspiracy involved the cement market.  Finally, it is not plausible

to infer from the allegations in the DSCAC that Defendants, Continental Florida Materials Inc.;

Cemex Materials, LLC; Cemex Construction Materials Florida, LLC;  Suwannee American Cement

---

[25]  Defendants argue Plaintiffs' allegation that the existence of a concrete conspiracy depends on a
cement conspiracy means if the Court finds no cement conspiracy is alleged then a concrete conspiracy is
not plausible.  However, horizontal price-fixing is a *per se* violation of section 1, and to state a claim under
section 1 in a *per se* case, "neither a relevant market nor an estimate of defendants' market power must be
established in order to prove that the restraint is unlawful." XI Phillip E. Areeda & Herbert Hovenkamp,
ANTITRUST LAW ¶ 1910, at 280 (3d ed. 2007).

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

LLC; Preferred Materials, Inc.; or Votorantim Cimentos North America, were directly involved in the alleged conspiracy.[26]

**B.     Indirect Purchaser Plaintiffs' Claim for Damages Under the FDUTPA**

Unlike the Direct Purchaser Plaintiffs, the three Indirect Purchaser Plaintiffs[27] do not buy cement and concrete directly from Defendants, but instead allegedly purchase cement or concrete "indirectly from one or more of the Defendants, their subsidiaries, divisions, units or affiliates." (ICTCAC ¶ 15).  The Supreme Court has held indirect purchasers may not recover damages for a violation of section 1 of the Sherman Antitrust Act.[28]  *See Ill. Brick Co. v. Ill.*, 431 U.S. 720, 746 (1977) ("[W]e conclude that the legislative purpose . . . [of the Clayton Act] is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.") (internal citations omitted).  However, Indirect Purchaser Plaintiffs may seek damages under the FDUTPA. *See Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 105 (Fla. 1st DCA 1996) ("A fair reading of section 501.211 reveals no intention by the legislature to limit suits for price-fixing to direct purchasers only.").

---

[26]  Special issues with respect to the liability of Preferred and VCNA are discussed below.

[27]  These three named Plaintiffs seek to represent a "Cement Indirect Class" defined as, "All persons or entities who purchased Cement indirectly from one or more of the Defendants or their co-conspirators in the state of Florida at any time during the period of January 1, 2004 to the present." (ICTCAC ¶ 61).  They also seek to represent a "Concrete Indirect Class" defined as, "All persons or entities who indirectly purchased Concrete which was sold originally either as Cement or Concrete by one or more of the Defendants or their co-conspirators or an Independent Concrete Producer . . . in the State of Florida at any time during the period January 1, 2004 to the present." (*Id.* ¶ 62).

[28]  However, Indirect Purchaser Plaintiffs may still (and do) seek injunctive relief under the Clayton Act, 15 U.S.C. § 26.

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

Defendants argue Indirect Purchaser Plaintiffs fail to state a claim under the FDUTPA.  The

FDUTPA, Fla. Stat. §§ 501.201–23, is designed "[t]o protect the consuming public and legitimate

business enterprises from those who engage in unfair methods of competition, or unconscionable,

deceptive, or unfair acts or practices in the conduct of any trade or commerce."  *Id.* § 501.202(2).

"[A] consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair

practice; (2) causation; and (3) actual damages."  *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla.

2d DCA 2006) (citations omitted).  Put another way, in order to state a FDUTPA claim for damages

"a plaintiff must show not only that the conduct complained of was unfair, unconscionable, or

deceptive, but also that it has suffered actual damages proximately caused by the unlawful conduct."

*Hanson Hams, Inc. v. HBH Franchise Co., LLC*, No. 03-61198-CIV, 2004 WL 5470401, at *4 (S.D.

Fla. Dec. 21, 2004) (citing *Macias & Himes v. Brown & Co. Secs. Corp.*, 518 So. 2d 937, 938 (Fla.

3d DCA 1988)).

Defendants argue Indirect Purchaser Plaintiffs do not state a FDUTPA claim because (1)

there is no plausible antitrust conspiracy which qualifies as a deceptive or unfair practice, and (2)

Indirect Purchaser Plaintiffs do not plead sufficient facts showing Defendants' conduct caused them

injury and that they suffered actual damages.  These arguments are addressed in order.

### 1.      Deceptive or Unfair Practice

As discussed, the Plaintiffs adequately allege the existence of an unlawful agreement to fix

the price of concrete among certain Defendants after the arrival of Wagner to head Prestige.

Defendants do not dispute that an adequately alleged conspiracy under section 1 of the Sherman

Antitrust act is an unfair practice under the FDUTPA.

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

### 2.    Causation, Injury and Damages

Defendants contend Indirect Purchaser Plaintiffs plead no "factual basis that any conspiracy harmed them or caused them damages." (Mot. 74). The ICTCAC is 64 pages long and contains more than 250 paragraphs. Only three of those paragraphs contain allegations specific to the three named Plaintiffs. Here are those three paragraphs:

> 15. Plaintiff, Philip D. Sanford, is a resident of Florida, residing in Collier County, Florida. During the Class Period, Plaintiff purchased Cement and Concrete indirectly from one or more of the Defendants, their subsidiaries, divisions, units or affiliates and was damaged as a result of Defendants' unlawful conduct. As a result, Plaintiff paid supra-competitive and artificially inflated prices for Cement and Concrete and has been injured by reason of the illegal conduct alleged herein.

> 16. Plaintiff, Starfish, Inc. . . . is an Alabama corporation with its principal place of business at 114 Blacksher Street, Brewton, Alabama 36426. During the Class Period, Starfish purchased Concrete indirectly from one or more wholly-owned subsidiaries of the Defendants, including reinforced concrete pipe and concrete structures and was damaged as a result of Defendants' unlawful conduct. Starfish indirectly purchased Concrete for construction projects in Okaloosa, Escambia, Santa Rosa, and Walton counties in Florida during the Class Period. As a result, Plaintiff paid supra-competitive and artificially inflated prices for Cement and Concrete and has been injured by reason of the illegal conduct alleged herein.

> 17. Plaintiff, Sterling Development Company . . . is a Florida corporation with its principal place of business at 4393 Common Drive East, Destin, Florida 32541. During the Class Period, Sterling purchased Cement and/or Concrete indirectly from one or more wholly owned subsidiaries of the Defendants and was damaged as a result of Defendants' unlawful conduct. Sterling indirectly purchased Concrete for construction projects in Bay, Okaloosa, and Walton counties in Florida during the Class Period. As a result, Plaintiff paid supra-competitive and artificially inflated prices for Cement and Concrete and has been injured by reason of the illegal conduct alleged herein.

(ICTCAC ¶¶ 15–17).

These allegations amount to "unadorned, the defendant-unlawfully-harmed-me allegation[s]," *Iqbal*, 129 S. Ct. at 1937, which contain no "factual content that allows the court to draw the

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

reasonable inference" the Defendants' conspiracy caused any injury to these Plaintiffs, *id*. at 1949

(citing *Twombly*, 550 U.S. at 556). The ICTCAC does not allege sufficient information about what

particular products were purchased from which Defendants, or whether these particular indirect

purchasers absorbed the alleged price increases or passed them on to their customers. Even before

*Twombly*, allegations like the ones in the ICTCAC would not have been sufficient. *See, e.g., Lydia*

*Sec. Monitoring, Inc. v. Alarm One, Inc.*, No. 07-80145 CIV, 2007 WL 2446889, * 5 (S.D. Fla.

August 23, 2007) ("The only allegation regarding injury is the statement that [Plaintiff] 'suffered

damages.' This is insufficient. Moreover, [Plaintiff] fails to allege that [Defendant] caused that

damage. Merely stating 'as a result' does not provide sufficient allegations to show causation in an

FDUTPA claim."). Indirect Purchaser Plaintiffs do not adequately allege Defendants' conduct

caused them harm or that they suffered damages, and consequently, they do not state a FDUTPA

claim.

**C.      Remaining Arguments**

      **1.      VCNA's Liability for Alleged Antitrust Violations by Prestige**

      Plaintiffs allege VCNA is liable for the antitrust violations of its subsidiary, Prestige.[29]  In

the Response, Plaintiffs maintain VCNA is liable (1) for its own "direct" involvement in the

conspiracy, (2) for Prestige's acts as its agent, and (3) as part of a "Single Economic Enterprise" with

Prestige and Suwannee. (*See* Resp. 85, 95).

---

      [29]  Plaintiffs also allege VCNA is liable for the antitrust conduct of its joint venture partner, the cement producer, Suwannee. Because the DSCAC does not adequately allege a cement conspiracy, it is not necessary to address VCNA's potential liability for Suwannee's conduct in the Florida cement market.

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

Plaintiffs assert VCNA is liable for its own "direct" involvement in the conspiracy; the word "direct" is placed in scare quotes because Plaintiffs make only two specific factual allegations of "direct" involvement by VCNA in the concrete conspiracy.  First, they allege "Wagner could not make operational or budgeting decisions — such as setting prices or making even relatively small purchases — without approval from VCNA executives."  (DSCAC ¶ 48).  But this implies Wagner made the pricing decisions and then sought approval from VCNA, not that VCNA dictated the price of concrete to Wagner.  This interaction is nothing more than VCNA's ordinary, indirect management of the operations of its distinct legal affiliate, Prestige.  Second, Plaintiffs allege that sometime after Wagner arrived to head Prestige, the CEO and president of VCNA met with Wagner and an officer of Cemex while Cemex and VCNA were holding meetings in the same hotel.  This allegation suggests an opportunity to conspire but does not permit a plausible inference VCNA is directly involved in the alleged concrete conspiracy.  Based on these allegations, it is not plausible to infer VCNA is involved in the alleged unlawful agreement.

Plaintiffs also contend VCNA is liable for Prestige's involvement in the alleged conspiracy because Prestige acts as an agent for VCNA.  In the Eleventh Circuit an agency relationship requires "(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003) (citing *MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1354 (S.D. Fla. 2000)).[30]  With

---

[30] An agency relationship can also be based on apparent authority.  "Apparent authority exists when the principal creates the appearance of an agency relationship."  *Whetstone Candy*, 351 F.3d at 1078.  But Plaintiffs allege no facts suggesting the other alleged co-conspirators assumed Prestige had the authority to bind VCNA to the allege unlawful agreement.

respect to the third element, "there must be . . . so much control that the subsidiary has 'no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.'" *Whetstone Candy*, 351 F.3d at 1077 n.14 (quoting *MeterLogic, Inc.*, 126 F. Supp. 2d at 1356–57). The Court cannot find any factual allegations in the DSCAC from which it can infer the first two elements are satisfied. The third element requires a very high level of parent control over the subsidiary, but the DSCAC contains only one factual allegation about VCNA's alleged control over Prestige — that Wagner had to get price changes and purchases approved. This lone allegation does not suggest "that the subsidiary has 'no separate corporate interests of its own and functions solely to achieve the goals of the dominant corporation.'" *Id*. It is not plausible to infer from the allegations in the DSCAC that Prestige acted as VCNA's agent in the alleged conspiracy.[31]

---

[31] Cases cited by Plaintiffs are easily distinguished. Plaintiffs principally rely on *Fitzpatrick v. Commonwealth Oil Co.*, 285 F.2d 726 (5th Cir. 1960). In that case, unlike here, the subsidiary corporation was created solely for the purpose of entering and carrying out the contract at issue. *See id.* at 730. Plaintiffs also cite *Doe v. Exxon Mobil Corp.*, which, in contrast to this case, was based on tort claims. 573 F. Supp. 2d 16, 31–32 (D.D.C. 2008) (concluding a reasonable trier of fact could find the three elements of the agency test satisfied with respect to the subsidiary's military security where the parent corporation designed, funded, and implemented a security policy that led to the torture and killing of civilians). Additionally, in *Doe*, the parent corporation almost completely controlled the subsidiary's security policy, rather than simply approving the subsidiary's decisions, as is alleged here. *See id.* In *S & Davis Int'l, Inc. v. The Republic of Yemen*, the alleged agent corporation was a political subdivision of the Republic of Yemen, which had "admitted that it '[was] an "agency or instrumentality" of The Republic of Yemen,'" and the Republic of Yemen was alleged to have ordered the corporation to breach the contract at issue. 218 F.3d 1292, 1298–99 (11th Cir. 2000). In this case, there are no facts alleged to suggest VCNA ordered Prestige to enter the alleged unlawful agreement.

*Specialty National Insurance Co. v. U-Save Auto Rental of America, Inc.*, applies a different agency standard than the one articulated by the Eleventh Circuit in *Whetstone Candy*. *Specialty Nat'l Ins. Co.*, No. 8:07-CV-878-33MAP, 2008 WL 4888864, at *9 (M.D. Fla. Nov. 12, 2008) ("To establish an agency relationship, the franchisor must have, by contract, action, or representation, 'directly or apparently participated in some substantial way in directing or managing acts of the franchisee.'") (quoting *Font v. Stanley Steemer Int'l, Inc.*, 849 So. 2d 1214, 1216 (Fla. 5th DCA 2003)). Moreover, in *Specialty Nat'l Ins. Co.*, the court found the franchisor liable on an asset purchase agreement where evidence indicated the franchisor directly negotiated the asset purchase at issue on behalf of its franchisee. *See id.* at 10. Here, there are no allegations VCNA directly negotiated the alleged unlawful agreement.

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

Plaintiffs advance one other basis for VCNA's liability for the actions of Prestige (and Suwannee). They allege VCNA, Prestige, and Suwannee operate as one single economic entity. (*See* Resp. 95). Plaintiffs purport to base this "single economic entity" theory of parent liability for the antitrust conduct of a subsidiary on the Supreme Court's decisions in *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), and *Am. Needle, Inc. v. Nat'l Football League*, 130 S. Ct. 2201 (2010). Those cases concerned "whether the coordinated acts of a parent and its wholly owned subsidiary can, in the legal sense contemplated by § 1 of the Sherman Act, constitute a combination or conspiracy." *Copperweld,* 467 U.S. at 759. In *Copperweld*, the Supreme Court held that because a parent and its wholly owned subsidiary have a complete unity of interest, they are "incapable of conspiring with each other for purposes of § 1 of the Sherman Act." 467 U.S. at 777. In *American Needle*, the Supreme Court upheld *Copperweld* but found the "[t]hirty-two [National Football League] teams operating independently through the vehicle of the [National Football League Properties] are not like the components of a single firm that act to maximize the firm's profits;" that is, they did not share a unity of interest. 130 S. Ct. at 2215.

Plaintiffs argue "Defendants within the VCNA corporate family show a unity of economic interest such that each of the companies, including VCNA, may appropriately be sued for its participation in the conspiracy here." (Resp. 96). But Plaintiffs do not explain why, if *Copperweld*

---

Finally, the court in *Norsul Oil & Min. Co., Ltd. v. Texaco, Inc.*, found parent corporations liable for subsidiaries' obligations with respect to underpayments of royalties where, in addition to the subsidiary CEO reporting to the parent companies, the subsidiaries refused to release royalty checks without parent approval, and a payment intended for one of the subsidiaries was made directly to one of the parent companies. 703 F. Supp. 1520, 1550 (S.D. Fla. 1988). In this case, there is no suggestion VCNA and Prestige mingled accounts as occurred in *Norsul*.

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

eliminated antitrust liability for cooperation between parent corporations and subsidiaries like VCNA and Prestige, VCNA should be held liable for Prestige's alleged participation in the concrete conspiracy in this case. The Tenth Circuit's handling of a similar argument in *Mitchael v. Intracorp, Inc.*, is instructive:

> Plaintiffs wish to extend *Copperweld* to hold that a subsidiary and its parent . . . can be considered one entity for all § 1 purposes, and either one can be liable for conspiring to restrain trade, even where there is no evidence that both were involved in the challenged conduct. We reject this extension. Despite *Copperweld's* expansive language about the economic unity of a parent and subsidiary, the [Supreme] Court held only that "the coordinated activity" of a parent and subsidiary must be viewed as that of a single enterprise for § 1 purposes . . . . [W]e decline to be the first court to interpret *Copperweld* dicta in the expansive way plaintiffs wish.

179 F.3d 847, 857 (10th Cir. 1999) (citing *Bellsouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*, 719 F. Supp. 1551, 1568 (S.D. Fla.1988), *rev'd* on other grounds, 999 F.2d 1436 (11th Cir. 1993) (other internal citations omitted)). The allegations in the DSCAC are not sufficient under any of Plaintiffs' theories to infer VCNA is liable for Prestige's alleged involvement in antitrust activity.

**2.      Preferred's Alleged Contractually Acquired Antitrust Liability**

The arguments of Defendant Preferred, which Plaintiffs alleged contractually assumed antitrust liability when it purchased Rinker and Cemex assets in 2007, need not be addressed because the actions that would give rise to Preferred's liability occurred before Wagner arrived to head Prestige.

**3.      Fraudulent Concealment**

Similarly, the Court does not address Plaintiffs' argument that Defendants fraudulently concealed the existence of the conspiracy, because the DSCAC only plausibly alleges a conspiracy

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

that began after the arrival of Wagner.  The section 1 conspiracy claim that survives the Motion to

Dismiss falls entirely within the Clayton Act's 4-year statute of limitations for a section 1 claim.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1. The Motion to Dismiss the Direct Purchaser Plaintiffs' Second Consolidated Amended Complaint (Direct **[ECF No. 205]**) is **GRANTED in part** and **DENIED in part**.

2. Direct Purchaser Plaintiffs shall file an amended complaint no later than October 29, 2010. The amended complaint shall be limited to the conduct of Prestige AB Management Co. LLC; Cemex Inc.; Florida Rock Industries, Inc.; and Tarmac America LLC with respect to ready-mix concrete during the period surrounding and after the arrival of Jorge Wagner as President of Prestige.

3. The Second Consolidated Amended Complaint (Direct **[ECF No. 203]**) is **DISMISSED** with respect to Defendants, Continental Florida Materials Inc.; Cemex Materials, LLC; Cemex Construction Materials Florida, LLC; Suwannee American Cement LLC; Preferred Materials, Inc.; and Votorantim Cimentos North America.

4. The Motion to Dismiss the Indirect Purchaser Plaintiffs' Corrected Third Amended Consolidated Complaint (Indirect **[ECF No. 111]**) is **GRANTED in part and DENIED in part**.

50

Master Docket No. 09-23187-CIV-ALTONAGA/Brown
Master Docket No. 09-23493-CIV-ALTONAGA/Brown

5.     Indirect Purchaser Plaintiffs shall file an amended complaint no later than October

29, 2010.  The amended complaint shall be limited to the conduct of Prestige AB

Management Co. LLC; Cemex Inc.; Florida Rock Industries, Inc.; and Tarmac

America LLC with respect to ready-mix concrete during the period surrounding and

after the arrival of Jorge Wagner as President of Prestige.

6.     The Corrected Third Amended Consolidated Complaint (Indirect **[ECF No. 109]**) is

**DISMISSED** with respect to Defendants, Continental Florida Materials Inc.; Cemex

Materials, LLC; Cemex Construction Materials Florida, LLC;  Suwannee American

Cement LLC; Preferred Materials, Inc.; and Votorantim Cimentos North America.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 12th day of October, 2010.


_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

51