UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

*In re* FLORIDA CEMENT AND      MASTER DOCKET NO. 09-23493-CIV-
CONCRETE ANTITRUST LITIGATION    ALTONAGA/Bandstra

*(INDIRECT PURCHASER ACTION)*

_____/

## ORDER

**THIS CAUSE** came before the Court on Indirect Purchaser Plaintiffs' Motion for Class

Certification ("Motion") [ECF No. 197], filed on September 21, 2011. Defendants, Cemex, Inc.

("Cemex"), Florida Rock Industries, Inc. ("Florida Rock"), VCNA Prestige Ready-Mix Florida

("Prestige"), Inc., and Tarmac America LLC ("Tarmac") (collectively, "Defendants"), filed their

Joint Opposition to the Motion ("Response") [ECF No. 228] on November 16, 2011, and Plaintiffs

filed their Reply [ECF No. 242-1] on December 13, 2011. The Court has carefully considered the

parties' written submissions, oral arguments presented on December 19, 2011, and applicable law.

### I. BACKGROUND

This case concerns an alleged price-fixing conspiracy in the Florida concrete industry.[1]

Specifically, Plaintiffs claim Defendants were involved in an unlawful conspiracy among vertically-

integrated cement companies to fix, raise, stabilize, or maintain prices of, and allocate customers

and markets for, ready-mix concrete ("Concrete")[2] in the State of Florida. (*See* Fifth Amended

Consolidated Compl. ("Compl.") ¶¶ 1–8, 60 [ECF No. 146]). Plaintiffs allege that as a result of this

---

[1] A full background of this litigation can be found in the Court's previous Orders. *See, e.g.*, *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1297–1305 (S.D. Fla. 2010).

[2] Concrete is a mixture of cement, aggregate (sand, gravel, and crushed stone), and water. (*See* Compl. ¶ 61). The strength of Concrete is determined by the amount of water added, and is measured in pounds per square inch ("psi"). (*See id.* ¶ 63).

conspiracy, Plaintiffs suffered economic loss as they were forced to pay artificially-inflated prices for Concrete throughout the State of Florida. (*See id.* ¶ 5). In their Complaint, Plaintiffs bring claims pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, and under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Statutes §§ 501.201, *et seq.*

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to certify a class consisting of:

> All persons or entities who indirectly purchased Concrete from one or more of the Defendants or their co-conspirators in the State of Florida for their own use and not for re-sale at any time during the period from on or about February 11, 2008 to the present (the "Class Period"). Excluded from the Class are [sic] anyone who purchased structures, including completed homes, containing concrete, if those purchases did not specifically break out the cost of Concrete. Also excluded are Defendants and their subsidiaries, parents, or affiliates, and Defendants' co-conspirators, whether or not named as a Defendant in this Complaint.

(Mot. 9). At the December 19 hearing, Plaintiffs clarified that this class only includes persons or entities who indirectly purchased Concrete using a "cost plus contract."[3] (*See* Tr. of Dec. 19, 2011 Hr'g ("Hr'g Tr.") 16:12–14 [ECF No. 255]). Defendants oppose certification of this class on several grounds.

## II. LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). "Questions concerning class certification are left to the sound discretion of the district court." *Cooper v. Southern Co.*, 390 F.3d 695, 711 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (citing *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1386 (11th Cir. 1998)). With this "great power comes great responsibility; the awesome power of a district court must be

---

[3] A cost plus contract is defined as one in which "the contractor is paid an amount equal to costs plus specific overhead and profit." (Reply 8 (internal quotation omitted)).

'exercised within the framework of [Federal Rule of Civil Procedure] 23.'"  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).  Thus, to be entitled to class certification, the party seeking certification must have standing and must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as the requirements of at least one subsection of Federal Rule of Civil Procedure 23(b).  *See Klay*, 382 F.3d at 1250.

Rule 23(a) "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."  *Wal-Mart*, 131 S. Ct. at 2550.  Under Rule 23(a), the party seeking class certification has the burden of showing that the four requirements of numerosity, commonality, typicality, and adequacy of representation are satisfied. Rule 23(a) provides as follows:

> One or more members of a class may sue on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims and defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

The class must also satisfy one of the three additional requirements of Rule 23(b).  Plaintiffs assert a class is appropriate under Rules 23(b)(2) and 23(b)(3).  Rule 23(b)(2) provides that certification is appropriate where: "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  FED. R. CIV. P. 23(b)(2).  Alternatively, Rule 23(b)(3) provides that certification is available if the Court finds "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy." FED. R. CIV. P. 23(b)(3).

In examining whether the party seeking certification has satisfied the requirements of Rule 23, the Eleventh Circuit has counseled that "[a]lthough the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003). Indeed, the Supreme Court recently acknowledged that "'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Wal-Mart*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)) (internal citations omitted). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.*

## III. ANALYSIS

### A. Rule 23(a)

As stated, Plaintiffs must first satisfy the four requirements of Rule 23(a): (1) Numerosity; (2) Commonality; (3) Typicality; and (4) Adequacy. The Court examines each requirement in turn.

#### 1. Numerosity

With regard to the numerosity requirement, Plaintiffs must establish the class is so numerous that joinder of all members is impracticable. *See* FED. R. CIV. P. 23(a)(1). As a general rule, a group of more than 40 satisfies the numerosity requirement of Rule 23, a group of fewer than 21 does not, and the numbers in between are subject to judgment based on additional factors. *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009). "To meet this requirement, plaintiffs

need not prove the exact size of the proposed class, but rather need demonstrate only that the number is exceedingly large, and joinder impracticable." *In re Infant Formula Antitrust Litig.*, No. MDL 878, 1992 WL 503465, at *3 (N.D. Fla. Jan. 13, 1992) (citing *Anderson v. Bank of the South, N.A.*, 118 F.R.D. 136, 145 (M.D. Fla. 1987)).  Essentially, a plaintiff seeking to certify a class must make a showing with factual support that the numerosity will be satisfied.  *Vega*, 564 F.3d at 1267.

In this action, the proposed class is to include thousands of Concrete purchasers throughout the State of Florida who purchased Concrete indirectly from Defendants.  (*See* Mot. 11–12). Plaintiffs maintain that because the class numbers in the thousands and because the members of the class are geographically dispersed, joinder is impracticable.  (*See id.*).  Defendants do not contest this assertion.  Based on the foregoing, the Court finds Plaintiffs' proposed class satisfies the requirement of numerosity.

### 2.  Commonality

The second requirement for maintaining a class action under Rule 23 is that "there are questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  Rule 23(a)(2) "'does not require that all the questions of law and fact raised by the dispute be common' . . . or that the common questions of law or fact 'predominate' over individual issues."  *Vega*, 564 F.3d at 1268 (quoting *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986)).  Rather, "[t]he commonality requirement demands only that there be 'questions of law or fact common to the class.'"  *Id.* (quoting FED. R. CIV. P. 23(a)(2)).  As the Supreme Court recently explained, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Wal-Mart*, 131 S. Ct. at 2551 (internal quotations and citation omitted).  In other words, their claims "must depend upon a common contention" that is "capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the

validity of each one of the claims in one stroke." *Id.* at 2545.

Plaintiffs allege a price-fixing conspiracy: that beginning on February 11, 2008, Defendants, who together control more than 75% of Florida's Concrete industry, engaged in a conspiracy to fix, stabilize, and maintain prices of Concrete sold in Florida. In cases containing allegations of price-fixing, courts have consistently held that the nature of the antitrust conspiracy action compels a finding that common questions of fact and law exist. *See, e.g.*, *In re Infant Formula*, 1992 WL 503465, at *4 ("By the very nature of a conspiracy antitrust action, common questions of fact and law exist."); *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229, 232 (M.D. Fla. 1993) (same); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486-PJH, 2006 WL 1530166, at *3 (N.D. Cal. June 5, 2006) ("[T]he very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.") (citations omitted).

Likewise, here, the Court finds common questions of law and fact are implicated. Many of the issues in the instant action involve the Defendants' alleged conspiracy and the manner in which it may have affected the class as a whole. For example, questions such as whether the Defendants conspired to fix the prices for Concrete, the identity of each member in the conspiracy, and the time period during which the conspiracy existed — which could involve review of numerous documents going back years and testimony of Defendants' principals — would be better handled in one trial rather than in many trials. As the court reasoned in *In re Commercial Tissue Products*, "[i]f each class member proceeded individually, each would have to prove the existence and impact of the identical conspiracy to fix prices. Obviously, individual actions designed to prove identical elements would completely destroy any notions of judicial economy." 183 F.R.D. 589, 593 (N.D. Fla. 1998) (internal quotation marks and citation omitted).

The Eleventh Circuit has explained that the commonality requirement is a "relatively light

burden." *Vega*, 564 F.3d at 1268.  Given that common questions of fact and law exist among class members, the burden is met in this case, and the commonality prong of the Rule 23(a) analysis is satisfied.   Whether these common issues predominate will be discussed with regard to Rule 23(b)(3).

### 3. Typicality

The typicality prong requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."   FED. R. CIV. P. 23(a)(3).  "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)."  *Cooper v. Southern Co.*, 390 F.3d 695, 713 (11th Cir. 2004) (quoting *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001)).   "'[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large.'" *Cooper*, 390 F.3d at 713 (quoting *Prado-Stetman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)).  Plaintiffs maintain this requirement is satisfied because the named Plaintiffs' claims derive from the same alleged price-fixing conspiracy and are based on the same legal theories as those of absent class members.  (*See* Mot. 14–16).  In contrast, Defendants contend neither of the two remaining named Plaintiffs — Jane Kerrigan and Gables of Vero Beach ("GVB") — is representative or typical of the putative class members.  (Resp. 46–49).

With regard to Plaintiff Jane Kerrigan, Defendants assert she is not representative of the class for three reasons.  First, Kerrigan purchased Concrete from Couch Ready Mix, an entity not named as a Defendant, and of which Cemex is only a passive minority owner.  (*See id.* 46–47; Hr'g Tr. 35:17–36:9).  Thus, she has not been harmed by any of Defendants and lacks standing.   (*See* Resp. 47).   Second, Kerrigan purchased Concrete in the Northwest area of Florida, or the Panhandle, an area in which, as transaction data shows — and even the Direct Purchaser Plaintiffs

concede — Defendants did not operate. (*See* Mot. Ex. 1, Expert Report of Dr. Janus Ordover "Ordover Report" 5 n.9). Defendants maintain that because Kerrigan purchased in an area that is not part of the conspiracy, she lacks standing. (*See* Resp. 47). Third, there is no evidence that Kerrigan utilized a cost plus contract, as required by the class definition. (*See id.*). After careful review of the record and the parties' written and oral arguments, the Court agrees with Defendants' observations regarding Plaintiff Kerrigan, and finds she does not satisfy the typicality prong of the analysis.[4]

With regard to the other remaining named Plaintiff, GVB, Defendants contend it also fails to satisfy the typicality requirement. In particular, Defendants note GVB purchased Concrete indirectly "in or around May 2008" for repairs on its property. (Compl. ¶¶ 16–17). Although the purchase falls within the defined class period, Plaintiffs' own expert Dr. Hal Singer's analysis has concluded there was no impact from the alleged conspiracy prior to October 2008. (*See* Resp. 48 (citing Dep. of Hal J. Singer, Nov. 3, 2011 [ECF No. 245-2] ("Singer Dep.") 222:19–223:2)). Therefore, Defendants suggest GVB is not an appropriate Plaintiff. (*See id.*; Hr'g Tr. 36:15–37:12).

The Court agrees with Defendants. Because GVB's Concrete purchase predates the date on which even Plaintiffs' own expert claims there was any impact from the conspiracy, GVB cannot be considered to have claims typical to those of absent class members, nor could it adequately represent the class. Both Plaintiffs' Motion and the Complaint focus on an alleged $25 price increase that was put in place "between August 4, 2008 and September 12, 2008." (Mot. 6; *see* Compl. ¶ 92). The Court cannot discern how GVB, whose Concrete purchase occurred several months prior to that period, could have been affected by the alleged increase. Accordingly, GVB fails to satisfy the typicality prong of the Rule 23(a) inquiry.

---

[4] At the December 19 hearing, Plaintiffs seemed to concede this point, focusing their argument on the other named Plaintiff, Gables of Vero Beach. (*See, e.g.*, Hr'g Tr. 72:1–8).

### 4. Adequacy

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The Eleventh Circuit has described the adequacy prong of a class certification analysis as follows:

> Rule 23(a)(4) requires that the representative party in a class action "must adequately protect the interests of those he purports to represent." *Philips v. Klassen*, 502 F.2d 362, 365 (D.C. Cir. 1974). This "adequacy of representation" analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *In re HealthSouth Corp. Securities Litigation*, 213 F.R.D. 447, 460–61 (N.D. Ala. 2003). If substantial conflicts of interest are determined to exist among a class, class certification is inappropriate.

*Valley Drug Co.*, 350 F.3d at 1189. An adequate class representative must be one willing to vigorously litigate the action on behalf of the class. *Clausnitzer v. Fed. Express Corp.*, 248 F.R.D. 647, 657 (S.D. Fla. 2008). In the present action, because neither Kerrigan nor GVB satisfies the typicality prong of the Rule 23(a) analysis, it necessarily follows they cannot adequately prosecute the action. Thus, for the reasons articulated above, Plaintiffs fail to satisfy this prong as well.

In sum, Plaintiffs fail to satisfy the typicality and adequacy prongs of the Rule 23(a) analysis; on this basis alone the Motion must be denied. Nonetheless, the Court will conduct a brief analysis of the remaining portions of the Rule 23 inquiry.

### B. Rule 23(b)

In addition to establishing the elements of Rule 23(a), Plaintiffs must also show they satisfy at least one of the conditions of Rule 23(b). *See Klay*, 382 F.3d at 1250. As stated, Plaintiffs assert a class is appropriate under both Rule 23(b)(2) and Rule 23(b)(3).

#### i. Rule 23(b)(2)

Rule 23(b)(2) provides that certification is appropriate where "the party opposing the class

has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole. . . . " FED. R. CIV. P. 23(b)(2).  Where "a plaintiff seeks damages in addition to equitable relief, injunctive class certification is only appropriate if the money damages are incidental to the requested injunctive or declaratory relief." *DWFII Corp. v. State Farm Mut. Auto. Ins. Co.*, 271 F.R.D. 676, 686 (S.D. Fla. 2010) (internal quotations and citations omitted); *see also Vega*, 564 F.3d at 1265 n.8; *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1155 (11th Cir. 1983) (noting hybrid or Rule 23(b)(2) class action is not appropriate where the "appropriate relief relates exclusively or predominantly to monetary damages") (internal quotation and citation omitted); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998); *Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*, 271 F.R.D. 538, 546 (S.D. Fla. 2010).  This is because Rule 23(b)(2) "'does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.'"  *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 701 (S.D. Fla. 2004) (quoting *Swanson v. Mid Am, Inc.*, 186 F.R.D. 665, 669 (M.D. Fla. 1999)).

Money damages are "incidental" only when class members would be "automatically entitled" to them once class-wide litigation is established.  *Coastal Neurology*, 271 F.R.D. at 546; *see Allison*, 151 F.3d at 415; *Swanson*, 186 F.R.D. at 669 ("Incidental means that the monetary damages flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or the declaratory relief.") (internal quotation omitted).   In the present action, in which the Plaintiffs seek both monetary and injunctive relief, they fail to demonstrate that the money damages are merely "incidental" to the injunctive relief.  A finding of class-wide liability in this case would not "automatically" entitle class members to a fixed, uniform damages recovery.  *See Allison*, 151 F.3d at 415.   Instead, the calculation of money damages would require an

individualized determination regarding the amount by which each class member was injured as a result of the alleged conspiracy. Moreover, as Plaintiffs acknowledge, even the direct purchaser Plaintiffs concede the alleged conspiratorial conduct has ceased. (*See* Hr'g Tr. 72:14–16). For these reasons, the Court does not find injunctive relief is the primary relief sought in this case.

> ### ii.  Rule 23(b)(3)

Rule 23(b)(3) requires finding both (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3); *see also Vega*, 564 F.3d at 1277. These requirements are known as predominance and superiority. *See Behrend v. Comcast Corp.*, 655 F.3d 182, 190 (3d Cir. 2011).

Predominance "is perhaps the central and overriding prerequisite for a Rule 23(b)(3) class." *Id.* at 1278. "Common issues of fact and law predominate if they 'ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Klay*, 382 F.3d at 1255 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)) (alteration in original). "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Id.* Here, Defendants oppose certification, asserting Plaintiffs cannot prove common impact on the class members and that the calculation of damages for each class member would require an individualized factual determination.

> ### 1.  Common Impact

"The fact of injury or 'impact' is an essential element of the antitrust claims that requires

proof that . . . Plaintiffs suffered some injury that was caused by Defendants' antitrust violations." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 696 (S.D. Fla. 2004). "In an overcharge case, impact is shown through proof that: (1) Defendants charge more than they would have but-for their antitrust violation; and (2) class members made some purchases at the illegally inflated or stabilized price." *Id.* "[T]he question at [the] class certification stage is whether, if such impact is plausible in theory, it is also susceptible to proof at trial through available evidence common to the class." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 325 (3d Cir. 2008).

Plaintiffs acknowledge that, being indirect purchasers, they have a "double burden" at trial; they must first prove common impact on direct purchasers who bought Concrete from the Defendants, and then show that impact was passed through to the indirect purchaser class. (Hr'g Tr. 6:17–22; *see also* Mot. 7); *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 732–33 (1977) (noting that in indirect purchaser actions "[t]he demonstration of how much of the overcharge was passed on by the first purchaser must be repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff."). Plaintiffs maintain they will prove impact on a class-wide basis at trial by "(a) showing that the direct purchasers (general contractors, wholesalers, and other concrete intermediaries) who bought Concrete from the Defendants paid higher prices on average than prices that would have prevailed absent the alleged conspiracy; and (b) demonstrating that the direct purchasers passed this increase in their costs on, in whole or in part, to the Indirect Purchaser Class in the form of higher prices." (Mot. 7). After careful review, however, the Court finds Plaintiffs fail to satisfy either level of their burden.

### i. Impact on Direct Purchasers

First, with regard to the impact on the direct purchasers, Plaintiffs do not establish that impact is susceptible to proof through common evidence. Plaintiffs assert they will prove common

impact through evidence such as "qualitative economic opinions, the structure of the Concrete market, the fungibility of the product, Defendants['] collusive communications with one another, Defendants['] pricing behavior and other facts."  (Mot. 26).  In support of their assertion, they proffer the opinion of Dr. Hal J. Singer ("Dr. Singer").  (*See* Class Certification Report of Hal J. Singer, Ph.D. ("Singer Report") [ECF No. 199-1]).  Plaintiffs maintain Dr. Singer's Report demonstrates (1) "that the characteristics of the industry and pricing data indicate that Defendants' conspiracy would be effective in raising the prices of Concrete in Florida" and (2) that "[a]ny price increase that Defendants agreed upon affected the prices paid by all direct purchasers."  (Mot. 27).  Contrary to Plaintiffs' contention, Dr. Singer's initial Report states that he "cannot give a final conclusion on whether impact can be shown with common methods and evidence."  (Singer Report. ¶ 2).[5]

Furthermore, to the extent Plaintiffs' position is based on the existence of list prices used by Defendants, Plaintiffs fail to demonstrate that those list prices represent common evidence of impact.  Plaintiffs' argument with respect to the list prices is based on regression and correlation analyses contained within Dr. Singer's Supplemental Report, which are then relied on in Dr. Singer's Reply Report [ECF No. 242-8].  (*See* Reply 6).  These analyses are not contained in his initial Report, nor do Plaintiffs rely on them in their Motion.  Plaintiffs now seek to introduce Dr. Singer's new analyses and opinions without affording Defendants an adequate opportunity to respond.  Plaintiffs attempt to introduce the regression and correlation analyses by couching them as

---

[5]    Although Dr. Singer filed an untimely Supplemental Report [ECF No. 216], in which he purportedly conducts some regression analysis on this issue, the Court previously ordered that Dr. Singer's opinions be limited to those offered in his "preliminary" report.  (*See* Nov. 17, 2011 Order [ECF No. 226]).  Specifically, the Court ruled that "[i]f a proposed corrected or completed report or opinion prejudices Defendants, Plaintiffs may not supplement or correct the Report or opinion."  (*Id.* 20).  Notwithstanding the Court's Order, Plaintiffs' Reply repeatedly cites to the new analyses contained in the Supplemental Report. Consistent with the Court's previous Order, the Court will disregard any new opinions or analyses contained in the Supplemental Report that prejudice Defendants in any way.

evidence responding to Dr. Ordover's Report.  Nonetheless, these new regressions and correlation analyses clearly "exceed what can reasonably be called 'rebuttal evidence.'"[6]  *Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc.*, No. 603CV1860ORL19KRS, 2005 WL 2465020, at \*5 (M.D. Fla. Oct. 6, 2005); *see also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 501 (N.D. Cal. 2008) (striking five regressions contained in expert's reply declaration, which were not included in the expert's initial report, as procedurally improper).  As the court in *In re Graphics* commented, including this type of analysis for the first time in a reply declaration is "a clear-cut form of sandbagging and [i]s simply unfair."  *In re Graphics*, 253 F.R.D. at 501.

The new analyses should have been presented in Dr. Singer's initial Report.  Dr. Singer laments that he could not conduct these sorts of analyses at the time of his initial Report because he was not afforded an opportunity to question Defendants regarding their data.  (*See* Singer Report ¶ 2 n.3).  However, as the Court found in the November 17 Order, Dr. Singer's inability to obtain the relevant information and conduct those analyses was entirely the result of Plaintiffs' own conduct.  (*See generally* Nov. 17 Order).  In the Order, the Court placed the burden on Plaintiffs to persuade the Court that any supplement to Dr. Singer's Report would not prejudice Defendants.  Plaintiffs have failed to carry that burden.  It was "Plaintiffs' own delays and inefficiencies" that resulted in Dr. Singer's inability to provide a timely, complete opinion regarding common impact (*id.* 16), and the Court is unwilling to allow Plaintiffs to benefit from their conduct to the prejudice of Defendants.  Because these new opinions go beyond the scope of rebuttal evidence and clearly prejudice Defendants,[7] the Court will not rely on these supplemental analyses.  Thus, Plaintiffs'

---

[6]   In contrast, the portions of Dr. Singer's Report that address the purported flaws in Dr. Ordover's analysis are accurately described as rebuttal evidence and have been considered by the Court.

[7]   Plaintiffs contend Defendants have suffered no prejudice by the filing of Dr. Singer's Supplemental Report because Dr. Ordover "had over six weeks after receiving the supplemental report to respond to Dr. Singer." (Reply 7).  This same argument was presented by Plaintiffs in their response to Defendants' Motion

only evidence of common impact on direct purchasers is Dr. Singer's preliminary opinion, which is inconclusive on this issue.

After careful review of the evidence that is properly presented by Plaintiffs, the Court does not find they have shown the impact on direct purchasers is susceptible to proof by common evidence.[8]

### ii. Impact on Proposed Class Members

Second, even if Plaintiffs had established that impact on direct purchasers could be shown through common evidence, they fail to establish that an overcharge was passed down to all indirect purchasers included in the class. Plaintiffs contend Dr. Singer's Report establishes that the "price increase to direct purchasers were [sic] passed through into higher prices on the indirect purchasers who are members of the class." (Mot. 27 (citing Singer Report ¶¶ 64–82)). But Dr. Singer offers

---

to Preclude Supplementation, and was rejected by the Court in the November 17 Order. (*See* Nov. 17 Order 9–11, 17–19). In that Order, the Court found the late filing of the supplemental report "extremely prejudicial in this case because of the nature of the suit and the unique scheduling restrictions," noting that "[e]ach day that has gone by without a full and complete opinion and report is a day that Defendants have not been able to fully and accurately prepare their response." (*Id.* 17). As the Court explained, Plaintiffs consistently delayed in obtaining the relevant information and providing it to Dr. Singer; in fact, their dilatory behavior began with their late retention of Dr. Singer — four months after they received Defendants' data and two months before the report and class-certification motion were due. (*See id.* 14).

[8]   Defendants also argue Plaintiffs' assertion — that common evidence can be used to show impact on direct purchasers — is flawed because

> (1) the concrete industry in Florida includes thousands of unique product mixes that suppliers market and sell to different segments of the construction industry within distinct local geographic markets, and prices differ widely across these variables; and (2) even within each mix category, segment, or geographic region, customers differentiate between suppliers and negotiate the price of ready-mix concrete on the basis of a number of factors, including quality, service, timing, location, and their relationships with each supplier.

(Resp. 22). Defendants claim there are a number of factors present that influence the determination of Concrete prices, and thus an individualized inquiry of impact is necessary. This argument is more fully discusser in Defendants' Joint Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification [ECF No. 346]. It is unnecessary to conduct an in-depth analysis related to this argument, however, as Plaintiffs' position is flawed for the numerous other reasons addressed here. Notably, this argument was considered by the Court in its Order denying plaintiffs' motion for class certification in the Direct Purchaser Action, and was found to be persuasive. *See* Case No. 09-23187, ECF No. 373.

no methodology for determining whether pass-through actually occurred; instead, he simply assumes that for indirect purchasers who bought pursuant to a cost plus contract, "the pass through rate would typically be one hundred percent." (Singer Dep. 169:13–24). He bases his assumption on the fact that if all terms of a cost plus contract are carried out, then pass through *should* occur. (*See id.* 170:23–171:15). However, as Dr. Singer acknowledges, parties to such contracts do not always fully implement their terms, so even among those Plaintiffs who had a cost plus contract there is no guarantee the increased Concrete costs were actually passed through to them by the direct purchasers. (*See id.* 171:16–172:2). In other words, that a contract originally contemplated pass through does not mean the contract was in fact enforced or that it was not modified orally at a later date. Dr. Singer's assumption of a 100% pass-through rate simply disregards these very real possibilities. As a result, the entire basis for Dr. Singer's opinion is grounded on a faulty premise. *See In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 1:04-md-1628, 2008 WL 5661873, at *6 (S.D.N.Y. Feb. 20, 2008) (rejecting expert's damages analysis where the expert did not perform any detailed empirical analysis of pass through, but instead based his conclusion on limited data and an assumed uniform pass through rate).

Furthermore, the record evidence actually indicates that direct purchasers did *not* consistently pass on increases in Concrete prices to indirect purchasers. In fact, several general contractors and Concrete subcontractors have testified and submitted sworn declarations stating they were unable to pass on any increased Concrete costs to the end users. (*See* Resp. 2 (citing Mot. Exs. 6–10); *see also* Singer Dep. 190:3–191:9, 193:4–21). They note that even when cost plus contracts were used, they generally could not pass on any Concrete cost increases during the time of the alleged conspiracy because of the poor state of the construction market. (*See* Mot. Ex. 10, Decl. of Lloyd Hollingsworth ("Hollingsworth Decl.") ¶¶ 11–12; Mot. Ex. 26, Decl. of Murray Rice

("Rice Decl.") ¶¶ 4–5).   This testimony tends to show that any alleged overcharge was often absorbed by the direct purchasers before reaching the class members.   Dr. Singer offers no opinion to rebut this evidence.   Consequently, the Court would need to conduct an individualized inquiry to determine whether the alleged overcharge was in fact passed on to each putative class member.

In addition, as Defendants note and Dr. Singer acknowledges, many cost-plus contracts contain a guaranteed maximum clause, which, if triggered, could result in the Concrete cost not being passed through to indirect purchasers.   (*See* Hr'g Tr. 46:4–22; Singer Dep. 182:2–24).   Dr. Singer himself points out that the only way to know if a guaranteed maximum provision was triggered, thus preventing pass-through, is to look at every individual contract.   (*See* Singer Dep. 182:17–24) ("Q: How would you know if a guarantee maximum was triggered so that pass-through was limited? A: I think the only way that you know is if the price after the concrete cost increase exceeded the maximum.   Q: How would you figure that out?   A: You have to look at the contract. Q: For every contract?   A: If that's what your objective was, yes, you'd have to do that."). Consequently, this too would require an individualized inquiry.

Lastly, Plaintiffs seem to assert that even if Dr. Singer's analysis is deficient, the Motion should be granted because "an illegal price-fixing scheme presumptively impacts all purchasers of a price-fixed product in a conspiratorially affected market."   (Mot. 26).   Numerous courts have held that "because the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market."   *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 695 (D. Minn. 1995) (citing *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 327 (E.D.N.Y. 1982)); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1041 (N.D. Miss. 1993) ("[I]n an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to

pay the higher price."); *Behrend*, 655 F.3d at 191; *In re Potash*, 159 F.R.D. at 693; *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 518 (S.D.N.Y. 1996). Despite this presumption, however, Plaintiffs cannot demonstrate common impact by merely *alleging* a price-fixing conspiracy. *See In re Hydrogen Peroxide*, 552 F.3d at 321; *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 420–21 (5th Cir. 2004) ("There are no hard and fast rules . . . regarding the suitability of a particular type of antitrust case for class action treatment.") (internal citation and quotation marks omitted); *In re Commercial Tissue*, 183 F.R.D. at 595 ("[A] mere charge of conspiracy does not mean that common questions predominate."). Here, Defendants point to a myriad of record evidence — which Plaintiffs fail to rebut — that overcomes any initial presumption of common impact.

In sum, Plaintiffs fail to offer any basis to prove through common evidence that either direct purchasers or indirect purchasers were actually impacted by the conspiracy. Accordingly, the Motion must be denied.

### 2. Damages

Even assuming impact could be proven through common evidence, Plaintiffs fail to offer a viable methodology to calculate damages. "'[I]n assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods [for computing damages] are so insubstantial as to amount to no method at all . . . [Plaintiffs] need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis.'" *Klay*, 382 F.3d at 1259 (quoting *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 698). "Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." *Id.* at 1259–60 (footnote call numbers

omitted).

In order to calculate damages, Dr. Singer proposes a two-step analysis, which he opines will provide a reasonable estimate of damages for each member of the class.  (*See* Singer Report ¶¶ 84–102).    First,  he  proposes  to  calculate  damages  to  *direct*  purchasers  using  one  of  three methodologies: a regression model, benchmark model, or a NEIO model.  (*See id.* ¶¶ 84–100).  He claims  these  models  would  provide  the  average  actual  price  charged  by  Defendants  to  direct purchasers  and  the  average  "but  for"  price  the  direct  purchasers  would  have  paid  absent  a conspiracy.  (*See id.*).  Comparing those two average prices, he would obtain an average overcharge for each sale, and this percentage would be multiplied against all of the sales from Defendants to direct  purchasers  during  the  class  period  to  provide  an  aggregate  "pot"  of  damages.  (*Id.* ¶¶ 101–02). Second, Dr. Singer assumes that 100% of the Concrete costs will be passed through to indirect purchasers,  and  therefore  converts  the  "pot"  of  direct  purchaser  damages  to  a  "pot"  of  damages for the indirect purchaser class.  (*Id.* ¶ 101).

Defendants  contend  this  two-step  methodology  fails  for  several  reasons,  the  most  readily apparent one being that it would assign damages to indirect purchasers who suffered no harm at all. (*See*  Resp.  35–37).    Specifically,  Defendants  note  that  even  if  Dr.  Singer  could  perform  some analysis to calculate damages to direct purchasers — which he has not yet done — the second step of his analysis would necessarily fail because it is based on the faulty premise that 100% of the increased costs for Concrete would be passed through to indirect purchasers.  (*See id.*).  The Court agrees.  As discussed, Dr. Singer did not conduct any empirical analysis to test this premise or to otherwise determine an appropriate pass-through rate.  In fact, he acknowledges that not all cost-plus contracts will be carried out according to their terms.  (*See* Singer Dep. 171:16–172:2). Because the determination as to whether cost increases were in fact passed on to a particular

indirect purchaser involves an individualized inquiry, the Court cannot find Dr. Singer presents a plausible methodology for calculating damages on a class-wide basis.   Furthermore, Dr. Singer acknowledges he does not present any formula for determining how to allocate damages among the indirect purchaser plaintiffs.   (*See id.* 242:3–15).   Thus, even assuming he could arrive at an accurate "pot" of damages to attribute to indirect purchasers, he does not even opine that a method exists to properly apportion those damages to the class members.   Based on the foregoing, Plaintiffs fail to present a formula by which damages could be calculated on a class-wide basis.

## IV.  CONCLUSION

A district court is required to conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class.  Having conducted that rigorous analysis, and for the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 197]** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 3rd day of January, 2012.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record